UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
LAMEL JEFFERY, THADDEUS BLAKE, CHAYSE PENA, on Behalf of Themselves and Others Similarly Situated,

                              Plaintiffs,

                 -against-

THE CITY OF NEW YORK, BILL DE BLASIO, Mayor of New York City, Individually and in his Official Capacity, ANDREW CUOMO, Governor of the State of New York, Individually and in his Official Capacity, and P.O.s JOHN DOE #1-50, Individually and in their Official Capacity, (the name John Doe being fictitious, as the true names are presently unknown),

                              Defendants.

------------------------------------------------------------------X

**PROPOSED CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

**ECF CASE**

Plaintiffs Lamel Jeffery, Thaddeus Blake, and Chayse Pena, on behalf of themselves and others similarly situated, by their attorneys, Cohen & Fitch LLP, complaining of the defendants, respectfully alleges as follows:

**PRELIMINARY STATEMENT**

1.      Plaintiffs bring this action on behalf of themselves and others similarly situated seeking class certification compensatory damages and attorney's fees pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 for violations of theirs and others similarly situated civil rights, as said rights are secured by said statutes and the Constitutions of the State of New York and the United States.

2.      Under a policy, pattern, and practice set and enforced by defendant city and state officials from June 1, 2020, through June 8, 2020, Bill De Blasio, Andrew Cuomo, the City of

New York ("the City") (collectively "defendants"), the New York City Police Department ("NYPD"), and New York City Police Officers unlawfully imprisoned an entire City by legally prohibiting individuals from leaving their homes for any lawful purpose during certain hours of the day/night and/or lawfully exercising their freedom of movement, freedom of speech, their right to equal protection under the law and their right to be free from search, seizure, and arrest in the absence of probable cause in violation of the U.S. Constitution (the "Curfew Orders").

3.      Further, pursuant to defendants' policy, pattern, and practice, NYPD officers stopped, searched, seized, and arrested individuals without probable cause who had committed no crime, were lawfully outside their homes and/or exercising their right to free movement, travel, free assembly, and free speech in violation of the U.S. Constitution.

4.      Defendants' policy, pattern, and practice was enforced in predominantly low income, minority neighborhoods and/or otherwise in a manner that predominantly and disparately impacted individuals based on racial classifications while white affluent communities were largely permitted to violate the mandatory Curfew Orders without consequence in violation of the U.S. Constitution.

5.      Defendants' policy, pattern, and practice was constitutionally unnecessary and unjustified under the circumstances, not narrowly or rationally tailored to the purported purpose for which these policies were allegedly put into practice, and overly restrictive and harsh when balanced against the dangers they were purportedly designed to prevent when far less restrictive measures were readily available in violation of the U.S. Constitution.

## FACTUAL BACKGROUND

**Continuing Acts of Police Violence Against the Black Community Spark Nationwide Outrage**

6.       By now, all but the plainly ignorant would deny that Black and minority communities across the country have historically been the epicenter for discriminatory and violent law enforcement practices from the pre-civil war Black Codes, to Jim Crow, to the unpunished perpetrators of hate crimes during the Civil Rights Movement, to the more recent racially disparate practices of Stop and Frisk.

7.       This history of violence and racial injustice at the hand of law enforcement has only been highlighted over the last decade with several high-profile killings. *Some* of the names include:

- Eric Garner – July 2014;

- Michael Brown – August 2014;

- Tamir Rice – November 2014;

- Freddie Gray – April 2015;

- Walter Scott – April 2015;

- Alton Sterling – July 2016;

- Philando Castile – July 2016;

- Charles Kinsey – July 2016;

- Delrawn Small – July 2016;

- Stephon Clark – March 2018;

- Botham Jean – September 2018;

- Dominique Clayton – May 2019;

- Atatiana Jefferson – October 2019;

8.     Most recently, however, on March 13, 2020, Breonna Taylor was shot dead inside her own home during the execution of a search warrant; and, on May 25, 2020, George Floyd died in police custody after an officer continuously kneeled on his neck while he was in handcuffs despite his pleas for air.

9.     In the wake of these incidents – especially following George Floyd's death – tens of thousands of individuals exercising their constitutional rights under the First Amendment to voice their outrage at the repulsive abuse of power that had occurred, began protests and demonstrations in major cities across the country.

**Lawful Protests and Demonstrations Take Hold in New York City on May 28, 2020**

10.     With the massive public outcry ignited by the death of George Floyd, years of systemic police abuses were brought to the forefront and individuals rallied across U.S. cities to demand change and accountability in law enforcement agencies.

11.     New York City was no exception, and beginning on May 28, 2020, thousands of marchers, protestors, and demonstrators began gathering in various sections of the five boroughs to protest police brutality against Black and minority communities.

12.     As even defendants acknowledged – albeit disingenuously – these protests were necessary and important to address the continuing and systemic racial disparities, inequities and injustices present in law enforcement practices across the country.

13.     While thousands of individuals took part in the protests, even by defendants' own admission, the *vast majority* of demonstrators were peaceful and exemplified the lawful exercise of First Amendment freedoms bestowed under the United States Constitution.

**The Protests Were Overwhelmingly Peaceful Punctured with Scattered Incidents of Criminal Behavior by a Select Few**

14.     While it was outwardly recognized by most in the City – *including defendants* – that "the vast majority of protesters [we]re there peacefully," and should be lauded for their participation in lawful and protected First Amendment activity, there were – as one might reasonably expect in any mass demonstration prompted by outrage over acts of police violence – there were tumultuous and confrontational moments in some areas in the City and even incidents of looting, destruction of property, and violence by a small number of individuals.

15.     However, despite the inflammatory and racially divisive media, political and governmental commentary surrounding the protests, most observers – especially those who were actually living in New York City at the time – recognized that the majority of incidents of criminality involved property destruction and theft isolated to a few small pockets in the City.

16.     Specifically, there were reports that property destruction, vandalism, and looting occurred in the Bronx to stores on Fordham Road from Webster Avenue to Jerome Avenue, in Manhattan to stores on Sixth Avenue, in Herald Square, the Diamond District, and SoHo, and in downtown Brooklyn near the Barclay Center and outside of three police precincts.

**Defendants' Decision to Issue a Mandatory Citywide Curfew for the First Time in 75 Years in Response to Scattered Incidents of Low-Level Criminal Behavior**

17.     In response to the three days of overwhelmingly non-violent protesting and demonstration that took place between May 28th and May 31st, on June 1, 2020, defendants took the virtually unprecedented step of issuing a citywide Order, which made it illegal and unlawful for any city resident to set foot outside their home between the hours of 11:00 p.m. June 1, 2020, and 5:00 a.m. on June 2, 2020 ("June 1st Order").

18.     Specifically, the June 1st Order proscribed that during the aforementioned period, "no persons or vehicles may be in public," and that "any person who knowingly violate[d] the provisions in this Order [would] be guilty of a Class B misdemeanor."

19.     Thereafter, on June 2, 2020, defendants issued a second Curfew Order, which was substantially identical to the June 1st Order, but which extended and expanded the duration of citywide home confinement – namely, from the hours of 8:00 pm to 5:00 am from June 3, 2020, through June 8, 2020 ("June 2nd Order").[1]

20.     Prior to the June 1st Order and June 2nd Order (collectively the "Curfew Orders"), the last time an official curfew was imposed anywhere in New York City was in 1943, when then-mayor Fiorello LaGuardia ordered a curfew to halt Harlem protests after police shot and injured an African American soldier.

21.     However, unlike the present Curfew Orders, the 1943 curfew was imposed in connection with the deployment of the National Guard in order to curb race riots had already enveloped the neighborhood, *claimed the lives* of 6 individuals and *injured* 495.

22.     Similarly, in 1943 New York City had a small fraction of the population of the City today, and the curfew was imposed *solely* in Harlem and it lasted for approximately *one* day.

**The Curfew Orders' Infringed on Fundamental Rights Guaranteed Under the Constitution**

23.     There is a reason that City residents and the plaintiffs herein have never been subjected to anything close to the present Curfew Orders in over 75 years – and it is not because there have been no incidents of political, social, or racial unrest in the City over that time.[2]

---

[1] Defendant De Blasio terminated the Curfew Orders a day early on June 7, 2020 under mounting pressure from politicians and civil rights organizations.
[2] Indeed, there have been numerous and well documented instances of equally – if not more – vociferous and fervent

24.     Rather, since our country was established, the imposition of oppressive restrictions like curfews – especially in a city the size of New York – has almost always been resoundingly outweighed by the value that our country places on personal liberties and freedoms guaranteed under the Constitution.

25.     In that vein, the Supreme Court has long since recognized that "[t]he freedom to leave one's house and move about at will is 'of the very essence of a scheme of ordered liberty,'" and that as consequence "a curfew aimed at all citizens could not survive constitutional scrutiny…even though such a general curfew…would protect those subject to it from injury and prevent them from causing 'nocturnal mischief.'" [3]

26.     In other words, despite even the best intentions, such sweeping prohibitions on constitutionally guaranteed rights are seldom justified unless – at the time of their enactment – there exists a *clear, imminent danger so substantial* that it would *outweigh* the fundamental freedoms that the government seeks to strip away.

27.     Yet from June 1, 2020, through June 7, 2020 defendants' Curfew Orders did just that, making it illegal for millions of city residents to exercise their freedom of movement, freedom of speech, freedom of assembly and/or otherwise leave their home for any reason – outside of medical necessity – during the hours set forth in the Order (which for all but the first day of the Curfew Order began at a time when it was still daylight out). [4]

---

protesting, demonstration and even rioting throughout the City over the last 75 years, many of which exceeded the levels of violence exhibited by the Floyd protests yet never produced a citywide house arrest.
[3] Bykofsky v Boroough of Middletown, 429 US 964, 964-65 (1976).
[4] The only exceptions to this rule were for "police officers, peace officers, firefighters, first responders and emergency medical technicians, individuals travelling to and from essential work and performing essential work, people experiencing homelessness and without access to a viable shelter, and individuals seeking medical treatment or medical supplies." Peculiarly, however, essential workers were made exempt *only if* they were working, yet all other enumerated individuals – i.e. first responders – were exempt *regardless* of whether they were on or off duty. In other words, if an off-duty police officer wanted to go outside for an evening stroll, they were free to do so while their non-officer neighbor was confined to house arrest. Such an absurd distinction only exemplifies the haste and thoughtlessness of the Curfew Orders in the first instance.

**By All Objective Measures, there was Absolutely No Justification to Confine Millions of Individuals to House Arrest for Nine Hours a Day**

28.    The Curfew Orders were based on non-descript claims that their imposition was "necessary to protect the City and its residents from severe endangerment and harm to their health, safety and property," and that the specific times chosen were because the acts that purportedly "severe[ly] endanger[ing]" the health, safety, and property of the city's residents were allegedly "happening primarily during the hours of darkness, and [was] especially difficult to preserve public safety during such hours."

29.    However, even the language of the Curfew Orders belies the severity and extent of the alleged "severe endangerment," indicating only that "demonstration activities were subsequently *escalated*, by *some* persons, to *include* actions of assault, vandalism, property damage, and/or looting."

30.    First, it was abundantly clear – to all those living in the city, not blindly hypnotized by the sensationalistic media coverage and governmental commentary which sought to prey on racial tensions and stoke fear – that the extent to which the protest/demonstrations had "escalated" into criminal behavior was extremely limited.

31.    Further, generic claims of "act[s]" of assault, vandalism, property damage, and/or looting committed by "*some persons*" in a city of *millions* during demonstrations involving *tens of thousands* – which defendants admittedly were overwhelmingly peaceful – is woefully insufficient to justify the blanket confinement, detainment, seizure of millions against their will.

32.    By way of comparison – and assuming *arguendo* that arrests are a measure of criminality – there were approximately 1,000 arrests (250 per day) that occurred during the 4 days of protesting in New York City before the imposition of the curfew.

33.     By contrast, *before* the protests and the outbreak of COVID-19, there were approximately 31,643 arrests made in New York City in January and February alone – and average of *536 per day*.

34.      In other words, before the "escalated" demonstrations, millions of City residents went about their daily life without the necessity of a curfew despite the fact that the City was statistically at least *50% more dangerous* – with *more than twice the number of daily arrests* – than it was during the Floyd protests.

35.     Similarly, the NYPD's COMPSTAT statistics, which records *reported* crime, shows that the in the week *preceding* the issuance of the Curfew Orders, reports of the NYPD's Major 7 offenses (Murder, Rape, Robbery, Felony Assault, Burglary, Grand Larceny, Grand Larceny Auto) were actually down over 20%, meaning that the overwhelming majority of criminality that occurred during the protests, prior to the curfew, was for non-violent offenses such as vandalism, theft, and property damage.

36.      In short, while the Curfew Orders claim that they were "necessary to protect the City and its residents from severe endangerment and harm to their health [and] safety," the objective criteria that the City normally uses to showcase rises and falls in criminal activity shows that the City as a whole was actually *significantly safer* during the Floyd Protests then it was during normal, non-curfew periods.

37.      Indeed, if ever there was a question about the comparative urgency and necessity of the City's Curfew Orders, one need only look to the fact that similar measures were *NEVER* put in place to curb the spread of COVID-19 despite the fact that the virus had actually caused the deaths of thousands and it was widely believed that staying at home would curb the spread.[5]

---

[5] Defendants have repeatedly promulgated their COVID-19 slogan of: "Stay Home, Stop the Spread, Save Lives."

**Defendants' Inconsistent Statements Regarding the Purpose of the Order**

38.     Notwithstanding that there was no evidence to support defendants' claims of imminent danger necessary to justify such broad restrictions on fundamental liberties, defendants' own public statements also contradicted the alleged purpose of the Curfew Orders.

39.     In fact, defendant De Blasio repeatedly stated that the Curfew Orders were merely "new tool[s]" to "magnify [defendants'] ability to control the situation" and to "strengthen the strategies" of law enforcement to curb criminal activity.

40.     While it may very well be true that confining millions of people to house arrest will have a crime reduction effect, this is a far cry from a truly emergent situation that would present the clear and present danger of severe and imminent harm to justify such an unprecedented restriction.

41.     By way of analogy, for years people used to justify the NYPD's Stop and Frisk practices by claiming its effect on crime reduction, but *whatever* truth those claims *may* have had, its arguable utility as a useful law enforcement "tool" or "strategy" ultimately could not justify violating the rights of millions. The same is true for defendants' Curfew Orders.

**Defendants Failure to Balance the "Need" for a Curfew Against other Concerns or Consider Less Restrictive Alternatives to Accomplish the Same Goals**

42.     Not only was there no emergent or imminent danger that would have necessitated the Curfew Orders – orders which relegated the entire population of one of the largest cities in the world to house arrest – lacking, but the breadth, scope, and severity of the Curfew Orders were grossly disproportionate to any purported need for them in the first instance.

43.     For instance, per the Curfew Orders, "any person who knowingly violate[d] the provisions in th[e] Order[s] [was] guilty of a Class B misdemeanor."

44.     This is an extremely harsh penalty, a conviction for a B Misdemeanor carries potential penalties of up to 90 days imprisonment, one year of probation and/or a fine of up to five hundred dollars ($500), not to mention that a conviction carries with it a permanent criminal record, which could have untold future consequences in terms of employment, etc.

45.     However, rather than consider these consequences, defendants simply slapped their Curfew Orders on millions of residents under threat of criminal liability without thinking about whether there was a less severe method of accomplishing the same alleged goals of safety.

46.     For example, perhaps defendants could have considered a *civil fine* or *non-criminal* sanction for violation of the Curfew Orders; perhaps they could have considered a less prohibitive time frame – especially since by all known accounts, the severe instances of criminal behavior were happening after midnight; perhaps defendants might have considered a more narrow location restriction – namely, to retail areas of the City where nearly all serious incidents were occurring; or, perhaps they could have created exceptions for the Curfew Order for individuals who were in close proximity to their own personal residence.

47.     Any one of these measures would have at least been arguably justified and balanced in relation to the rights infringed upon and the purported necessity of the Curfew Orders and would have minimized the deprivation of liberty on millions.

**The Curfew Orders Occurred at a Time When Being Outside in Any Capacity Was a Mental Health Necessity**

48.     In addition to the lack of any attempt to balance the "need" for the Curfew Orders with the fundamental liberty interests of millions, there was also an utter lack of thought concerning the timing of the Order in light of the already prohibitive environment which had existed for months following the emergence of COVID-19.

49.     In particular, for months individuals have been substantially restricted – out of fear, safety concerns, and social distancing measures – from engaging in the normal life activities that millions had enjoyed prior to the pandemic.

50.     Accordingly, simply getting out of their homes responsibly – even for moments at a time – was an absolute mental health necessity for millions.

51.     Indeed, both state and local governments in New York had recognized that "[g]etting outdoors to walk, jog, hike, garden, ride a bicycle or visit a park are healthy ways to stay active, spend time with your family, and reduce stress and anxiety while engaging in social distancing strategies."

52.     Thus, defendants' Curfew Orders were not only a grossly disproportionate restriction on fundamental constitutional liberties but were also a needless restriction on one of the few ways that individuals could maintain levels of mental health after already several months of relative quarantine.

53.     Accordingly, the overly oppressive restrictions on the ability of millions to simply go outside for fresh air in the evening, coupled with the restraint on their ability to responsibly exercise their right to speech and assembly in the aftermath of George Floyd's death, made the Curfew Orders all the more unjustifiable and illegal.

**Defendants Arrest Approximately 1,349 for Violating the Curfew Orders**

54.     In addition to the seven days in which defendants' Curfew Orders effectively sentenced the entire city to house arrest, defendants also arrested and summonsed approximately 1,349 individuals for allegedly violating the Curfew Orders.

55.     Further, the claims made by defendant De Blasio to deflect criticism over the Curfew Orders – namely, that he "understood" that there would be many who would simply be

"going about their business or on their way home," and that individuals engaged in such lawful activities would "not run the risk of a confrontation with police" – proved to be false.

56.     In fact, more people were arrested for violating the Curfew Orders than were arrested for being engaged in the very criminal behavior that the Curfew Orders were purportedly implemented to protect in the first place.

57.     As a result, the plaintiffs herein – and over one thousand other New Yorkers – were subject to police confrontation in the form of stops, searches, seizures, arrests, handcuffing, summonses, and criminal prosecutions for doing nothing more than being outside of their homes in public after 8 p.m, and engaging in activity which would have been otherwise lawful in the absence of the Curfew Orders.

**The Disproportionate Enforcement of the Curfew Orders in a Racially Disparate Manner**

58.     In addition to the unconstitutional enactment and enforcement of the Curfew Orders as a whole, the impacts of the Curfew Orders were acutely felt by residents of predominantly Black and minority neighborhoods.

59.     Specifically, the plaintiffs herein, as well as other Black and minority individuals, comprise only 40% of the City's total population, *YET* somehow managed to receive nearly 70% of the curfew arrests and summonses (over 2 times as many as their white counterparts) during the defendants' enforcement of the Curfew Orders.

60.     This number does not account for the additional hundreds to thousands of individuals who were stopped, seized, and/or searched as the result of allegedly violating defendants' Curfew Orders.

61.     In other words, while defendant De Blasio's assurances that individuals engaged in legitimate and lawful behavior would not "risk confrontation with police," was likely true in

predominantly white neighborhoods, the same was *not true* in Black and minority neighborhoods where City's house arrest was strictly enforced thereby further compounding the unconstitutionality of their conduct.

**Millions of New Yorkers that Were Falsely Imprisoned in Their Homes for Seven Days**

62.     In addition to the thousands of individuals who were falsely stopped, searched, seized, arrested, and/or summonsed for allegedly violating the Curfew Orders, millions of New Yorkers remained otherwise imprisoned within their own homes during the Curfew Orders.

63.     These individuals were forced to stay inside for nine hours a day for a week, never venturing into the fresh air for a moment between dusk till dawn, lest they risk police confrontation, arrest, and/or prosecution for violating blatantly unconstitutional Curfew Orders.

64.     In short, in a time where stress levels were already at a peak and the need for some quantum of stress relief outdoors – if even for a moment – was at its greatest due to the COVID-19 pandemic, defendants forced millions of law-abiding residents to suffer to stress and deprivation of liberty of house arrest for an entire week, all because of the petty criminal behavior of a scattered few.

**The Racially Divisive Curfew Orders Were Constitutionally Overbroad and Unnecessary Under the Circumstances and Recompense Must be Made to Those Affected**

65.     As a result of defendants' unconstitutional Curfew Orders, thousands of New Yorkers were deprived of their freedom of movement and assembly, freedom of speech and subjected to deprivations of liberty in the form of stops, searches, seizures, arrests, summonses, handcuffing, and criminal prosecution for doing nothing more than being outside of their homes in public after 8 p.m and engaged in otherwise lawful activity.

66.     The enforcement of the Curfew Orders was visited primarily, predominantly, and impermissibly on Black and minority residents of New York City in violation of their constitutional guarantees of Equal Protection under the law.

67.     As a result of defendants' unconstitutional Curfew Orders, millions of New Yorkers were falsely imprisoned, deprived their freedom of movement, freedom of speech and unconstitutionally deprived of their liberty in the form of house arrest under threat of confrontation with police, search, seizure, arrest and/or criminal prosecution.

68.     These Curfew Orders were unnecessary and unjustified under the circumstances as criminal activity prior to the imposing of the Curfew Orders was quite limited in scope, severity, and location.

69.     These Curfew Orders were unconstitutionally overbroad, and not narrowly or rationally tailored to the purported dangers for which they were designed to protect.

70.     The Curfew Orders were overly severe in comparison to the dangers presented prior to their institution and overly restrictive, severe, and unbalanced in proportion to the liberty interest at stake and the level of their constitutional infringement.

71.     These unconstitutional and illegal acts degrade, humiliate, and cause harm to their victims. Individuals are forced to suffer unwarranted deprivations of personal liberty with untold mental and personal consequences. The fact that this policy has since ended is of no assistance to the millions of New Yorkers already affected by Curfew Orders. Justice requires that defendants be held accountable for their oppressive, unreasonable, and unconstitutional behavior.

72.     This action is brought pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988, and the First, Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.

73.     Jurisdiction is founded upon 28 U.S.C. §§ 1331, 1343(a) and 1367.

## VENUE

74.     Venue is properly laid in the Eastern District of New York under U.S.C. § 1391(b), in that this is the District in which a substantial part of the events or omissions giving rise to the claim occurred and where at least one defendant resides.

## JURY DEMAND

75.     Plaintiffs respectfully demand a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

## PARTIES

76.     Plaintiff LAMEL JEFFERY was at all relevant times a resident of the City and State of New York.

77.     Plaintiff CHAYSE PENA was at all relevant times a resident of the City and State of New York.

78.     Plaintiff THADDEUS BLAKE was at all relevant times a resident of the City and State of New York.

79.     Defendant CITY OF NEW YORK was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York.

80.     Defendant CITY OF NEW YORK maintains the New York City Police Department, a duly authorized public authority and/or police department, authorized to perform all functions of a police department as per the applicable sections of the New York State Criminal Procedure Law, acting under the direction and supervision of the aforementioned municipal corporation, City of New York, who was responsible for the policy, practice, supervision, implementation, and conduct of all NYPD matters and was responsible for the

appointment, training, supervision, and conduct of all NYPD personnel, including the defendants referenced herein.   In addition, at all relevant times, Defendant City was responsible for enforcing the rules of the NYPD, and for ensuring that NYPD personnel obey the laws of the United States and of the State of New York.

81.     That at all times hereinafter mentioned P.O.s JOHN DOE #1-50 were training, supervisory, and policy-making personnel within the NYPD who implemented, enforced, perpetuated and/or allowed the unconscionable and unconstitutional enforcement activity to occur in connection with the Curfew Orders that are the subject of this action, acting in the capacity of agents, servants, and employees of defendant City and within the scope of their employment as such.   Plaintiffs are unable to determine the names of these NYPD Supervisory defendants at this time and thus sue them under a fictitious designation.

82.     At all relevant times defendant BILL DE BLASIO was the Mayor of the City of New York and, as such, was a "policymaker" who made and enforced the policies of the NYPD and the Curfew Orders that are the subject of this action, and who acted in his capacity as Mayor, agent, servant, and employee of defendant City, within the scope of his employment as such, and under color of state law.

83.     At all relevant times defendant ANDREW CUOMO was the Governor of the State of New York and, as such, was a "policymaker" who influenced, directed, made and enforced the Curfew Orders and policies that are the subject of this action, and who acted in his capacity as Governor, within the scope of his employment as such, and under color of state law.

84.     That at all times hereinafter mentioned the defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the

official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York and/or New York, Bronx, Kings, Queens and Richmond Counties.

85.     During all times mentioned in this complaint, the defendants and each of them separately and in concert, engaged in acts and/or omissions which constituted deprivations of plaintiffs' constitutional rights, equal protections, and the privileges and immunities of the plaintiffs, and while these acts were carried out under color of law, they had no justification or excuse and were instead illegal, improper, and unrelated to any activity in which law enforcement officers may appropriately and legally engage in the course of protecting persons and/or ensuring civil order.

## CLASS ACTION ALLEGATIONS

86.     Plaintiffs LAMEL JEFFERY, THADDEUS BLAKE, and CHAYSE PENA bring this action as a class action under Fed. R. Civ. P. 23(b)(3) for violations of their constitutional rights. The Rule (b)(3) Classes are comprised of all: a) all persons who were wrongfully stopped, searched, seized, arrested, detained, summonsed, and/or subjected to criminal prosecution in violation of their constitutional rights pursuant to defendants' policy, pattern and practice of enforcing unconstitutional Curfew Orders throughout the City from June 1, 2020, through June 7, 2020, who had otherwise committed no crime or violation of law; b) all individuals belonging to a suspect and protected racial classification who were disproportionately and wrongfully stopped, searched, seized, arrested, detained, summonsed, and/or subjected to criminal prosecution  in violation of their constitutional rights pursuant to defendants' policy, pattern and practice of enforcing unconstitutional Curfew Orders throughout the City from June 1, 2020, through June 7, 2020, who had otherwise committed no crime or violation of law; and, c) all individuals who were falsely imprisoned and prevented from leaving their homes under fear of

arrest, seizure, criminal prosecution in violation of their constitutional rights pursuant to defendants' policy, pattern and practice of enforcing unconstitutional Curfew Orders throughout the City from June 1, 2020, through June 7, 2020, who had otherwise committed no crime or violation of law.

87.    All members of the Rule (b)(3) classes were injured as a result of defendants' conduct.

88.    Upon information and belief, the Rule (b)(3) classes include hundreds of thousands of individuals and is so numerous that joinder of all class members is impracticable.

89.    The questions of law and fact presented by plaintiffs LAMEL JEFFERY, THADDEUS BLAKE, and CHAYSE PENA are common to other members of the class.  Among others, the questions of law and fact common to the class are: (i) that defendants had a policy, pattern, and practice of enforcing unconstitutional Curfew Orders; (ii) that these Curfew Orders were enforced in a racially disparate manner; (iii) the defendants' policy, pattern, and practice caused individuals to suffer deprivations of liberty and (vi) that the appropriate compensatory remedies that will be needed to ensure that the harmful effects of this practice are nullified and remedied.

90.    Common issues of law and fact such as those set forth above (and many others) predominate over any individual issues.

91.    This unconstitutional policy, pattern, and practice has resulted in the wrongful detention, charging, handcuffing, confinement, deprivation of liberty, prosecution, psychological, physical, and emotional injury of citizens who have committed no crimes or violations of law.  The claims and practices alleged in this complaint are common to all members of the class.

92.     The violations suffered by plaintiffs LAMEL JEFFERY, CHAYSE PENA, and THADDEUS BLAKE are typical of those suffered by the class.  The entire class will benefit from the monetary relief sought.

93.     Plaintiffs LAMEL JEFFERY, THADDEUS BLAKE, and CHAYSE PENA have no conflict of interest with any class members, and will fairly and adequately protect the interests of the class. Counsel that is competent and experienced in federal class action and federal civil rights litigation has been retained to represent the class. Cohen & Fitch LLP is a law firm with an office in New York City over (12) years of civil litigation experience. Further, Cohen & Fitch LLP has extensive experience in civil rights litigation against state and local governments, and the NYPD, and also has experience in class action lawsuits. Further Cohen & Fitch LLP is also experienced in police, prosecutorial, and court practices in the criminal courts throughout New York City given the fact that the partners of Cohen & Fitch LLP were both former prosecutors and have also maintained a significant criminal defense practice. Collectively, the firm has litigated thousands of civil rights claims against the City of New York and the NYPD and has an intimate knowledge of the criminal process from arrest through prosecution.

94.     This action is superior to any other method for the fair and efficient adjudication of this legal dispute, as joinder of all members is not only impracticable but impossible given the volume of the violations as well as the transient nature of the members of the class.  The damages suffered by certain members of the Class, although substantial, are small in relation to the extraordinary expense and burden of individual litigation and therefore it is highly impractical for such Class members to attempt redress for damages incurred individually.

95.     There will be no extraordinary difficulty in the management of the Class action.

## FACTS

96.     Plaintiff LAMEL JEFFERY is a twenty (20) year old African American man.

97.     Plaintiff THADDEUS BLAKE is a thirty-four (34) year old African American man.

98.     Plaintiff CHAYSE PENA is a twenty (20) year old Hispanic man.

### *The Constitutional Violations against Lamel Jeffery*

99.     On June 4, 2020, at approximately 10:00 p.m., plaintiff LAMEL JEFFERY was attending a barbeque in the vicinity of Eastern Parkway and Franklin Avenue, Kings County, New York.

100.     At the aforesaid time and place, NYPD officers arrived and approached plaintiff who was committing no crimes or violations of law and commanded plaintiff to go inside of the building where the barbeque was occurring outside of.

101.     While plaintiff did not live in that building, he informed the officers that he would go home, which was around the corner.

102.     However, as plaintiff began to walk towards his home several NYPD officers aggressively stopped and tackled plaintiff and placed him in handcuffs despite having no probable cause to do so.

103.     Plaintiff was verbally, physically, and mentally abused by the officers although he had committed no crimes or violations of law.

104.     Plaintiff was then taken into NYPD custody and held for approximately ten (10) hours, where plaintiff was not free to leave until the officers released him without charges.

**_The Constitutional Violation Against Thaddeus Blake_**

105.    On June 5, 2020, at approximately 8:39 p.m. plaintiff THADDEUS BLAKE was in the vicinity of 350 East 143 Street, in Bronx County, New York.

106.    At the aforesaid time and place, plaintiff was lawfully standing in front of the building where he resided when NYPD officers approached plaintiff for no legitimate reason and ordered him to go inside his building.

107.    At the time, plaintiff was charging his phone in an electrical outlet connected to the building and informed the officers that he would go inside but needed to first retrieve his phone.

108.    However, despite having committed no crimes or violations of law, several officers aggressively approached and seized plaintiff without probable cause, slamming him to the ground and aggressively handcuffing him behind his back.

109.    Plaintiff was verbally, physically, and mentally abused by the officers although he had committed no crimes or violations of law.

110.    Plaintiff was then taken into NYPD custody and held for approximately five (5) hours, where plaintiff was not free to leave until the officers released him with a criminal summons requiring him to appear in court.

111.    Upon information and belief, those charges will be dismissed in their entirety.

**_The Constitutional Violation Against Chayse Pena_**

112.    On June 5, 2020, at approximately 10:00 p.m. plaintiff CHAYSE PENA was in the vicinity of West 49th Street and 9th Avenue, New York County, New York.

113.    At the aforesaid time and place, plaintiff was lawfully present in the neighborhood of his residence attempting to find a parking space when he was stopped by several NYPD officers in a patrol car.

114.    Although plaintiff lived in the neighborhood and explained to the officers the reason he was outside, he was ordered out of his vehicle.

115.    Even though plaintiff had committed no crimes or violations of law, several officers searched plaintiff and his car – yielding no contraband – and then placed him in restraints with his arms behind his back without probable cause.

116.    Plaintiff was verbally, physically, and mentally abused by the officers although he had committed no crimes or violations of law.

117.    Plaintiff was then taken into NYPD custody and held for approximately four (4) hours, where plaintiff was not free to leave until the officers released him with a criminal summons requiring him to appear in court.

118.    Upon information and belief, those charges will be dismissed in their entirety.

### *The Unconstitutional Custom, Policy, and Practice of the City*

119.    At all relevant times, the City, acting through the NYPD, maintained an express policy, custom and practice of unconstitutional Curfew Orders, thousands of New Yorkers were deprived of their freedom of movement and assembly, freedom of speech, freedom and subjected to deprivations of liberty in the form of stops, searches, seizures, arrests, summonses, handcuffing, and criminal prosecution for doing nothing more than being outside of their homes in public at night and engaged in otherwise lawful activity.

120.    The enforcement of the Curfew Orders was visited primarily, predominantly, and impermissibly on Black and minority residents of New York City in violation of their constitutional guarantees of equal protection under the law.

121.    As a result of defendants' unconstitutional Curfew Orders, millions of New Yorkers were falsely imprisoned, deprived their freedom of movement, freedom of speech and unconstitutionally deprived of their liberty in the form of house arrest under threat of confrontation with police, search, seizure, arrest and/or criminal prosecution.

122.    These Curfew Orders were unnecessary and unjustified under the circumstances as criminal activity prior to the imposing of the Curfew Orders was quite limited in scope, severity, and location.

123.    These Curfew Orders were unconstitutionally overbroad, and not narrowly or rationally tailored to the purported dangers for which they were designed to protect.

124.    The Curfew Orders were overly severe in comparison to the dangers presented prior to their institution and overly restrictive and unbalance in proportion to the liberty interest at stake and level of constitutional infringement.

125.    The conduct of the defendants has been a substantial factor in the harassment, confinement, and deprivation of liberty suffered by the plaintiffs herein and a proximate cause of the constitutional violations and damages alleged in this complaint.

## FIRST CLAIM FOR RELIEF FOR DEPRIVATION OF FEDERAL RIGHTS UNDER 42 U.S.C. § 1983

126.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the proceeding paragraphs with the same force and effect as if fully set forth herein.

127.    All of the aforementioned acts of defendants, their agents, servants, and employees, were carried out under the color of state law.

128.     All of the aforementioned acts deprived plaintiffs and the members of the Class of the rights, equal protections, privileges and immunities guaranteed to citizens of the United States by the First, Fourth, Fifth, Eighth and Fourteenth Amendments to the Constitution of the United States of America, and in violation of 42 U.S.C. § 1983.

129.     The acts complained of were carried out by the aforementioned individual defendants in their capacities as policymakers, city and state officials and/or police officers with all of the actual and/or apparent authority attendant thereto.

130.     The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers, pursuant to the customs, usages, practices, procedures, and the rules of the City of New York and the New York City Police Department, all under the supervision of ranking officers of said department.

131.     Defendants, collectively and individually, while acting under color of state law, engaged in conduct that constituted a custom, usage, practice, procedure, or rule of the respective municipality/authority, which is forbidden by the Constitution of the United States.

**SECOND CLAIM FOR RELIEF**
**FOR VIOLATION OF FOURTH AMENDMENT RIGHTS UNDER 42 U.S.C. § 1983**

132.     Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the proceeding paragraphs with the same force and effect as if fully set forth herein.

133.     As a result of defendants' aforementioned conduct, plaintiffs and other members of the Class were subjected and unreasonable deprivations of liberty in the form of illegal, and improper stops, searches, seizures, detention, confinement, arrest, summonsing and criminal prosecution by the defendants, without any probable cause, privilege, consent or any legitimate basis under the law.

134.    Defendants illegal Curfew Orders have caused the class to be "arrested" in their movements without and legitimate basis to do so under the law and without probable cause to believe that they have committed any crimes or violations of law.

135.    As a direct and proximate result of the misconduct and abuse of authority detailed above, plaintiffs sustained the damages hereinbefore alleges.

136.    As a result of the foregoing, plaintiffs' and members of the Class' liberty was restricted for an extended period of time, and they were put in fear for their safety, were humiliated and subjected to handcuffing, and other restraints, without probable cause.

## THIRD CLAIM FOR RELIEF VIOLATION OF
## FIRST AMENDMENT RIGHTS UNDER 42 U.S.C. § 1983

137.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the proceeding paragraphs with the same force and effect as if fully set forth herein.

138.    The actions taken by defendants violated plaintiff's first amendment right to freedom of speech and peaceably assemble.

139.    Defendants' unlawful and constitutional conduct constituted a prior restraint on plaintiffs' ability to peaceably assemble and engaged in protected speech in their own neighborhoods, public sidewalks, and in areas open and freely accessible to the general public.

140.    Defendants' Curfew Orders were enforced in a manner that prohibited the peaceable gathering of minority residents of New York City in their own neighborhoods.

141.    Defendants' policy is designed and to keep said residents inside of their homes thereby preventing them from exercising their rights to speech and peaceably assemble on public streets and areas in violation of their rights as secured by the First Amendment.

142.    The Curfew Orders have been enforced in a manner that essentially prevents minority residents in low-income neighborhoods from exercising their rights to assemble

whatsoever in their own neighborhoods in areas that are and should be accessible to the public at large in violation of their rights under the First Amendment.

143.    Defendants' Curfew Orders were unnecessary and unjustified under the First Amendment as the circumstances as criminal activity prior to the imposing of the Curfew Orders were quite limited in scope, severity, and location.

144.    Defendants' Curfew Orders were unconstitutionally overbroad, and not narrowly or rationally tailored to the purported dangers for which they were designed to protect in violation of the First Amendment.

145.    Defendants' Curfew Orders were improperly balanced under the First Amendment in that the criminal sanctions and liberty restrictions were overly severe in comparison to the dangers presented prior to their institution.

146.     As such, defendants' conduct in having an implementing said policy is in direct violation of plaintiffs' and other members of the Class, rights to freedom of speech, and assembly as secured by the First and Fourteenth Amendments.

**FOURTH CLAIM FOR RELIEF VIOLATION OF FOURTEENTH AMENDMENT RIGHTS UNDER 42 U.S.C. § 1983**

147.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the proceeding paragraphs with the same force and effect as if fully set forth herein.

148.    As a result of defendants' aforementioned conduct, plaintiffs and other members of the Class were subjected and unreasonable deprivations of liberty, restrictions, and prohibitions on their freedom of travel and movement in the form of unconstitutional Curfew Orders.

149.   The Curfew Orders unconstitutionally restricted, prohibited, and/or otherwise curtailed plaintiffs' and other members of the Class, freedom of movement by confining them to house arrest under threat of stop, seizure, arrest, and prosecution.

150.    The Curfew Orders unconstitutionally restricted, prohibited, and/or otherwise curtailed plaintiffs' freedom of movement and other members of the Class, by subjecting plaintiffs to illegal, and improper stops, searches, seizures, detention, confinement, arrest, summonsing and criminal prosecution for doing nothing more than being in public outside of their homes.

151.   Defendants illegal Curfew Orders have unconstitutionally restricted, prohibited and/or otherwise curtailed plaintiff's freedom of movement by "arresting" them in their movements and/or confining them to house arrest without and legitimate basis to do so under the law and without probable cause to believe that they have committed any crimes or violations of law.

152.   Defendants' Curfew Orders were enforced in a manner that disparately affected the rights movement and travel of minority residents of New York City in their own neighborhoods.

153.   Defendants' policy is designed and to keep residents inside of their homes thereby preventing them from exercising their rights to be present and move freely for lawful purposes outside of their homes on public streets and areas in violation of their rights as secured by the Fifth and Fourteenth Amendments.

154.   Defendants' Curfew Orders were unnecessary and unjustified so as to deprive plaintiffs of their fundamental right to freedom of travel and movement under the Fifth and

Fourteenth Amendments as the circumstances as criminal activity prior to the imposing of the Curfew Orders was quite limited in scope, severity, and location.

155.    Defendants' Curfew Orders were unconstitutionally overbroad, and not narrowly or rationally tailored to the purported dangers for which they were designed to protect, in violation of the Fifth and Fourteenth Amendment.

156.    Defendants' Curfew Orders were improperly balanced under the Fifth and Fourteenth Amendments in that the criminal sanctions and liberty restrictions were overly severe in comparison to the dangers presented prior to their institution.

157.    As such, defendants' conduct in having an implementing said policy is in direct violation of plaintiffs' rights, those of the Class, to freedom of movement, and travel as secured by the Fifth and Fourteenth Amendments.

158.    As a direct and proximate result of the misconduct and abuse of authority detailed above, plaintiffs sustained the damages hereinbefore alleges.

159.    As a result of the foregoing, plaintiffs' and members of the Class' liberty was restricted for an extended period of time, and they were put in fear for their safety, were humiliated and subjected to handcuffing, and other restraints, without probable cause.

## FIFTH CLAIM FOR RELIEF VIOLATION OF
## EQUAL PROTECTION UNDER THE FIFTH AND FOURTEENTH AMENDMENTS
## UNDER 42 U.S.C. § 1983

160.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in the proceeding paragraphs with the same force and effect as if fully set forth herein.

161.    The Curfew Order was enforced against plaintiff in a manner that disparately affected them based on their racial demographic in violation of their rights as secured by the Fifth and Fourteenth Amendments of the Constitution.

162.   The conduct of the City has been to enforce their illegal Curfew Orders disproportionally in predominantly Black and minority neighborhoods although these Orders were constitutionally illegitimate and plaintiffs had committed no crimes or violations of law.

163.   Other similarly situated white residents have not been impacted or targeted in the same manner by these illegal Curfews in violation of the rights of these racial minorities as secured by the Fifth and Fourteenth Amendments to the Constitution.

164.   As a result of the foregoing, a class of plaintiffs in certain racial classifications were disproportionally subjected to heavier and stricter enforcement of the illegal Curfew Orders in the form of confrontations with police, stops, searches, seizures, arrests, restraints, confinement, and criminal prosecution without any reasonable or compelling basis in violation of their rights under the Fifth and Fourteenth Amendments.

## SIXTH CLAIM FOR RELIEF FOR
## MUNICIPAL LIABILITY UNDER 42 U.S.C. § 1983

165.   Plaintiffs repeat, reiterate and reallege each and every allegation contained in the proceeding paragraphs as if the same were more fully set forth at length herein.

166.   During the seven days in which defendants Curfew Orders sentenced the entire City to house arrest, the plaintiff class was subject to police confrontation in the form of stops, searched. seizures, arrests, handcuffing, summonses, and criminal prosecutions for doing nothing more than being outside of their homes in public after 8 p.m., and engaging in activity which would have been otherwise lawful in the absence of the Curfew Orders.

167.   The enforcement and impacts of the Curfew Orders were acutely felt by residents of predominantly Black and minority neighborhoods.

168.    Members of the plaintiff class were unlawfully confined to house for seven days between dusk till dawn, lest they risk police confrontation, arrest and/or prosecution for violating blatantly unconstitutional Curfew Orders.

169.    The acts complained of were carried out by the aforementioned individual defendants and subordinate officers of the NYPD in their capacities as police officers and officials, with all the actual and/or apparent authority attendant thereto.

170.    The acts complained of were carried out by the aforementioned individual defendants and subordinate NYPD officers in their capacities as police officers and officials pursuant to the customs, policies, usages, practices, procedures, and rules of the City of New York and the New York City Police Department, all under the supervision of defendants DEBLASIO and CUOMO and other ranking officers of said department.

171.    The unlawful Curfew Order was established and enforced by City and State policy-making officials within the NYPD and caused the deprivation of plaintiffs' rights and those of other Class members.

172.    The aforementioned customs, policies, usages, practices, procedures, and rules of the City of New York and the New York City Police Department include, but are not limited to, the following unconstitutional practices:

i.      Establishing, implanting and enforcing Curfew Orders in violation of the First, Fourth, Fifth and Fourteenth Amendments;

ii.     Subjecting thousands of New Yorkers to deprivations of liberty, freedom of movement and travel, assembly and speech in the form of stops, searches, seizures, arrests, summonses, handcuffing and criminal prosecution for doing nothing more than being outside of their homes in public after 8 p.m and engaged in otherwise lawful activity;

iii.    Enforcing illegal Curfew Orders primarily, predominantly and impermissibly on Black and minority residents of New York City in violation of their constitutional guarantees of equal protection under the law;

iv.     Subjecting millions of New Yorkers to false imprisonment, deprivation of their

freedom of movement, freedom of speech, freedom of assembly in the form of house arrest under threat of confrontation with police, search, seizure, arrest and/or criminal prosecution;

v.      Establishing and enforcing Curfew Orders that were unnecessary and unjustified under the circumstances as criminal activity prior to the imposing of the Curfew Orders was quite limited in scope, severity, and location;

vi.     Establishing and enforcing Curfew Orders were unconstitutionally overbroad, and not narrowly or rationally tailored to the purported dangers for which they were designed to protect;

vii.    Establishing and enforcing Curfew Orders were overly severe in comparison to the dangers presented prior to their institution and overly restrictive and unbalance in proportion to the liberty interest at stake and level of constitutional infringement.

173.    The existence of the aforesaid unconstitutional customs and policies may be inferred from repeated occurrences of similar wrongful conduct as is the case with the three (3) plaintiffs in this matter as well as the City's own statements, statistics, and reports.

174.    The foregoing customs, policies, usages, practices, procedures, and rules of the City of New York and the New York City Police Department constituted deliberate indifference to the safety, well-being, and constitutional rights of plaintiffs and members of the Class.

175.    The foregoing customs, policies, usages, practices, procedures, and rules of the City of New York and the New York City Police Department were the direct and proximate cause of the constitutional violations suffered by plaintiffs and members of the Class as alleged herein.

176.    The foregoing customs, policies, usages, practices, procedures, and rules of the City of New York and the New York City Police Department were the moving force behind the constitutional violations suffered by plaintiffs and the members of the Class as alleged herein.

177.    As a result of the foregoing customs, policies, usages, practices, procedures, and rules of the City of New York and the New York City Police Department, plaintiffs and members of the Class were subject to police confrontation in the form of house arrest, stops,

searches, seizures, arrests, handcuffing, summonses and criminal prosecutions in the absence of any criminal behavior or wrongdoing.

178.    As a result of the foregoing customs, policies, usages, practices, procedures, and rules of the City of New York and the New York City Police Department, plaintiffs and members of the Class were caused to appear in court to be prosecuted unconstitutionally and in many instances causing them to lose time from work or school in violation of their constitutional rights.

179.    As a result of the foregoing customs, policies, usages, practices, procedures, and rules of the City of New York and the New York City Police Department, plaintiffs and members of the Class were targeted based on an impermissible classification under the Equal Protection Clause of the Fourteenth Amendment, their race.

180.    As a result of the foregoing customs, policies, usages, practices, procedures, and rules of the City of New York and the New York City Police Department, plaintiffs and members of the Class were deprived of their rights to liberty, speech, assembly, movement and travel under the First, Fourth, Fifth and Fourteenth Amendments to the Constitution.

181.    Defendants, collectively and individually, while acting under color of state law, were directly and actively involved in violating the constitutional rights of plaintiffs and members of the Class.

182.    Defendants, collectively and individually, while acting under color of state law, acquiesced in and encouraged a pattern of unconstitutional conduct by subordinate police officers, and were directly responsible for the violation of the constitutional rights of plaintiffs and members of the class.

183.    All of the foregoing acts by defendants deprived plaintiffs and members of the Class of federally protected rights, including, but not limited to, the right:

ii.     Not to be deprived of liberty without due process of law;

iii.    To be free from search, seizure and arrest not based upon probable cause;

iv.     Freely move lawfully outside one's home;

v.      To receive equal protection under the law;

vi.     To peaceably assemble and express free speech.

**WHEREFORE**, plaintiffs and members of the Class request the following relief jointly and severally as against all of the defendants:

1. A judgment declaring that defendants have committed the violations of law alleged in this action;

2. Compensatory damages against all defendants in an amount to be proven at trial;

3. Punitive damages against all defendants, except the City, in an amount to be proven at trial;

4. An order awarding disbursements, costs, and attorneys' fees pursuant to 42 U.S.C. § 1988; and

5. Such other further relief that the court may deem just and proper.

Dated: New York, New York
       June 26, 2020


                                    BY:_____/S_____
                                        COHEN & FITCH LLP
                                        JOSHUA P. FITCH (JF-2813)
                                        GERALD M. COHEN (GC-0414)
                                        ILYSSA S. FUCHS (IF-9628)
                                        225 Broadway, Suite 2700
                                        New York, N.Y. 10007
                                        (212) 374-9115


                    *Attorneys for Plaintiffs and the Putative Class*