UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------
LAMEL JEFFERY, THADDEUS BLAKE, CHAYSE
PENA, on Behalf of Themselves and Others Similarly
Situated,

             Plaintiffs,

**<u>20 CV 02843</u>**
**(NGG)(RML)**

       -against-

THE CITY OF NEW YORK, BILL DE BLASIO, Mayor of
New York City, Individually and in his Official Capacity,
ANDREW CUOMO, Governor of the State of New York,
Individually and in his Official Capacity, and P.O.s JOHN
DOE #1-50, Individually and in their Official Capacity,
(the name John Doe being fictitious, as the true names are
presently unknown),

             Defendants.

-------------------------------------------------------------------

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO <u>DEFENDANTS' MOTIONS TO DISMISS</u>

JOSHUA FITCH
COHEN & FITCH LLP
Attorneys for Plaintiff
110 E. 59th St., Suite 3200
New York, N.Y. 10022
(212) 374-9115
jfitch@cohenfitch.com

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................. ii

PRELIMINARY STATEMENT ......................................................................... 1

STATEMENT OF FACTS ................................................................................. 2

MOTION TO DISMISS STANDARD ................................................................ 3

ARGUMENT ..................................................................................................... 4

I.     DEFENDANTS' CANNOT ESTABLISH THE CONSTITUTIONALITY OF THE CURFEW ORDERS AT THIS STAGE OF THE LITIGATION ..................................... 4

     A.    The Curfew Must Pass Strict Scrutiny Review Because It Infringed upon the Fundamental Rights of Millions of Individuals ........................................ 4

          i.    The Curfew in this Case Could Never Survive Strict Scrutiny at this Stage of the Litigation ......................................................................... 7

     B.    There is No Support Under Existing Law to Support the Notion that Fundamental Rights Are Diminished in an Emergency ............................................. 10

          i.    There has Never Been an "Emergency Exception" to Constitutional Rights or to the Modern Tiers of Constitutional Scrutiny ........................ 11

          ii.    The Non-Binding Outer Circuit Decision in <u>Chalk</u> Does Not Support the Existence of an Emergency Exception to Constitutional Standards ......... 13

     C.    Even Under Defendants' Erroneous Standard of Review, the Curfew Orders Cannot be Constitutionally Validated at this Time ................................. 15

          i.    The Allegations in the Complaint and Defendants' Own Public Statements Clearly Create Factual Issues Surrounding the Existence of a Genuine Emergency as well as the Necessity and Utility of the Curfew . 16

          ii.    The Cases Cited in Defendants' Brief Cannot Provide a Legal or Factual Basis for Summarily Upholding the Curfew Absent Discovery .............. 18

II.    PLAINTIFF'S FALSE ARREST CLAIMS MUST PROCEED BECAUSE PROBABLE CAUSE TURNS ON THE CURFEW'S CONSTITUTIONALITY ................................ 20

III.   DEFENDANTS MAY NOT AVAIL THEMSELVES TO QUALIFIED IMMUNITY FOR THE DECISION TO IMPOSE THE CURFEW ........................................... 21

A.  It was Clearly Established that Adult Curfews Must be Precisely Tailored to Serve Compelling State Interests and in the Least Restrictive Way to Achieve that Interest.................................................................................................................21

B.  Defendants Cannot Create Ambiguity in the Law by Referencing Outer Circuit Decisions that have Never Been Accepted by the Second Circuit or the Supreme Court ...................................................................................................................23

IV.  THE ALLEGATIONS HERE PLAUSIBLY ESTABLISH THE PERSONAL INVOLVEMENT OF BOTH DEFENDANTS..................................................................25

A.  There are Ample Allegations and Evidence to Qualify Both Defendant de Blasio and Defendant Cuomo as Policy-Makers for the City ..........................................25

B.  The Rules of Group Pleading Are Not Violated Where the Allegations and Claims are Asserted Against All Defendants Jointly and Severally .................................27

C.  The Factual Allegations and Defendants' Public Acceptance of Personal Responsibility for the Curfew Are More than Sufficient to Establish Liability ....28

V.  THERE IS NO LEGAL OR FACTUAL BASIS FOR DEFENDANT CUOMO'S ARGUMENT REGARDING DISMISSAL OF PLAINTIFFS' EQUAL PROTECTION CLAIM .......................................................................................................................31

A.  Comparator Evidence is Not Required Where Plaintiffs' Equal Protection Claim Arises from Discriminatory Law Enforcement Practices ......................................31

B.  The Statistical Evidence Provided in the Pleadings as well as the Racial Demographics of the Named Plaintiffs Are Enough to Allow the Claim to Proceed.................................................................................................................33

CONCLUSION ............................................................................................................................35

<u>TABLE OF AUTHORITIES</u>

<u>Abreu v City of New York</u>, 657 F Supp 2d 357 (E.D.N.Y. 2009) ...................................................2

<u>Alford v City of New York</u>, 413 F Supp 3d 99, 104 (E.D.N.Y. 2018)................................... 28-29

<u>Ali v Connick</u>, 136 F Supp 3d 270 (E.D.N.Y. 2015).................................................................32, 33

<u>Am. Civil Liberties Union of W. Tennessee, Inc. v. Chandler</u>, 458 F. Supp. 456, 460 (W.D. Tenn. 1978)......................................................................................................................................19

<u>Anonymous v City of Rochester</u>, 13 NY3d 35 (2009) .............................................................6, 23

<u>Arbuckle v City of New York</u>, 2016 WL 5793741 (S.D.N.Y. Sept. 30, 2016)............................28

<u>Ayala v Looks Great Services, Inc.</u>, 2016 WL 3541548 (E.D.N.Y. June 23, 2016) ....................17

<u>Bayley's Campground Inc. v Mills</u>, 463 F Supp 3d 22 (D Me 2020), <u>reconsideration denied</u>, 2020 WL 3037252 (D Me June 5, 2020), and <u>affd</u>, 2021 WL 164973 (1st Cir Jan. 19, 2021)........10, 13

<u>Benacquista v. Spratt</u>, 2016 WL 6803156 (N.D.N.Y. 2016) ........................................................32

<u>Boudreau v Smith</u>, 2018 WL 4426010 (D. Conn. Sept. 17, 2018)..................................................3

<u>Breen v Garrison</u>, 169 F3d 152 (2d Cir 1999) .............................................................................23

<u>Bright v Nunn</u>, 448 F2d 245 (6th Cir 1971) .....................................................................13, 18, 19

<u>Brown v City of Oneonta, New York</u>, 221 F3d 329 (2d Cir 2000) ...............................................33

<u>Burtnieks v City of New York</u>, 716 F2d 982 (2d Cir 1983) ..........................................................15

<u>Bykofsky v Borough of Middletown</u>, 429 US 964 (1976) ...................................................*Passim*

<u>Cablevision Sys. Corp. v F.C.C.</u>, 570 F3d 83 (2d Cir 2009) .......................................................14

<u>Campbell v Westchester County</u>, 1998 WL 788791 (S.D.N.Y. Nov. 10, 1998) ...........................4

<u>Canon U.S.A., Inc. v. F & E Trading LLC</u>, 2017 WL 4357339 (E.D.N.Y. Sept. 29, 2017)........27

<u>Capozzi v Pennsylvania Bd. Probation & Parole</u>, 2019 WL 4309069 (MD. Pa. July 29, 2019), <u>report and recommendation adopted</u>, 2019 WL 4302282 (MD. Pa. Sept. 11, 2019) ...................33

<u>Catanzaro v Weiden</u>, 140 F3d 91 (2d Cir 1998), <u>on reh</u>, 188 F3d 56 (2d Cir 1999)....................18

<u>Chen-Oster v Goldman, Sachs & Co.</u>, 2019 WL 3294145 (S.D.N.Y. June 7, 2019) ...................34

<u>City of Chicago v Morales</u>, 527 US 41 (1999) ...............................................................................4

<u>Clack v. Torre</u>, 2014 WL 1050792 (D. Conn. 2014).....................................................................32

Cole v City of Memphis, 97 F Supp 3d 947 (WD Tenn 2015)......................................................6

Com. v Weston W., 455 Mass 24 (2009)......................................................................................6

Contant v City of New York, 2012 WL 1158756 (E.D.N.Y. Mar. 16, 2012), report and recommendation adopted, 2012 WL 1165623 (E.D.N.Y. Apr. 9, 2012)......................................23

DeBari v Town of Middleton, 9 F Supp 2d 156, 162 (N.D.N.Y. 1998) .......................................16

Doe v Vil. of Mamaroneck, 462 F Supp 2d 520 (S.D.N.Y. 2006) ...............................................32

Doe No. 1 v Putnam County, 344 F Supp 3d 518 (S.D.N.Y. 2018) ..............................................9

Duque-Nava, 315 F. Supp. 2d 1144 (D. Kan. 2004) ...................................................................33

Edrei v Maguire, 892 F3d 525 (2d Cir 2018) .............................................................................21

Embry v City of Cloverport, KY, , 2004 WL 191613 (WD Ky Jan. 22, 2004)......................... 5-6

Ervin v State, 41 Wis 2d 194 (1968)............................................................................... 13, 19-20

Estate of Booker v. Gomez, 745 F.3d 405 (10th Cir. 2014) ........................................................27

Gaffney v City of Allentown, 1997 WL 597989 (ED Pa Sept. 17, 1997) ...................................6, 9

Garcia-Diaz v Cintron-Suarez, 120 F Supp 3d 68 (D.P.R. 2015)...............................................26

Gardner v. Murphy, 613 F. App'x 40 (2d Cir. 2015) ..................................................................22

Gerskovich v Iocco, 2017 WL 3236445 (S.D.N.Y. July 17, 2017)..............................................28

Golodner v. Berliner, 770 F.3d 196 (2d Cir. 2014) ....................................................................22

Gronowski v Spencer, 424 F3d 285, 296-97 (2d Cir 2005) ........................................................26

Higazy v Templeton, 505 F3d 161 (2d Cir 2007).................................................................27, 29

Hill v City of New York, 136 F Supp 3d 304 (E.D.N.Y. 2015), order amended and supplemented, 2019 WL 1900503 (E.D.N.Y. Apr. 29, 2019) ..............................................33, 34

Hobbs v County of Westchester, 397 F3d 133 (2d Cir 2005) ........................................................7

Ho by Ho v San Francisco Unified School Dist., 965 F Supp 1316 (ND Cal 1997).....................9

In re Juan C., 28 Cal App 4th 1093 (Cal Ct App 1994)..............................................................13

In re Polaroid ERISA Litig., 362 F Supp 2d 461 (S.D.N.Y. 2005) .............................................27

Inturri v City of Hartford, Conn., 365 F Supp 2d 240 (D Conn 2005), affd sub nom. Inturri v City of Hartford, 165 Fed Appx 66 (2d Cir 2006)..................................................................22

Jacobson v Commonwealth of Massachusetts, 197 US 11 (1905) .........................................11, 12

Jacobson v Deutsche Bank, A.G., 206 F Supp 2d 590, 596 (S.D.N.Y. 2002), affd, 59 Fed Appx 430 (2d Cir 2003)..............................................................................................................17

Jana-Rock Const., Inc. v New York State Dept. of Economic Dev., 438 F3d 195 (2d Cir 2006) 35

Jimenez v City of New York, 605 F Supp 2d 485 (S.D.N.Y. 2009) ...........................................25

King v New Rochelle Mun. Hous. Auth., 442 F2d 646 (2d Cir 1971)..........................................4

Koziol v Hanna, 107 F Supp 2d 170 (N.D.N.Y. August 1, 2000), affd, 10 Fed Appx 36 (2d Cir 2001) ............................................................................................................................26

LaForgia v Vergano, 2017 WL 3034347 (S.D.N.Y. July 14, 2017).........................................28

Little v. City of N.Y., 2014 WL 4783006 (S.D.N.Y. Sept. 25, 2014) ...........................................3

Leebaert v. Harrington, 332 F.3d 134 (2d Cir 2003) ...................................................13

Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163 (1993)...............................................................................................................23

Magni v County of Luzerne, 2018 WL 3978977 (MD Pa Aug. 20, 2018)...................................21

Manganiello v. Agostini, 2009 WL 151724 (S.D.N.Y. January 21, 2009) ................................30

Marrero-Mendez v Calixto-Rodriguez, 830 F3d 38 (1st Cir 2016)...............................................24

McDonough v Nassau County Bd. of Co-op. Educ. Services, 2007 WL 3124550 (E.D.N.Y. Oct. 25, 2007) ..............................................................................................................23

McLoughlin v. People's United Bank, Inc., 586 F.Supp.2d 70 (D. Conn. 2008) ..........................7

McMillian v Monroe County, Ala., 520 US 781 (1997) ........................................................ 25-26

Meadows v Planet Aid, Inc., 676 F Supp 2d 83 (E.D.N.Y. 2009)................................................30

Meyer v Shulkin, 710 Fed Appx 453 (2d Cir 2017), as amended (Oct. 11, 2017)......................35

Mhany Mgt., Inc. v County of Nassau, 819 F3d 581 (2d Cir 2016)) ...........................................35

Mitchell v. Home, 377 F.Supp.2d 361 (S.D.N.Y. 2005) ..............................................................7

Montalvo v U.S. Postal Serv., 1996 WL 935448 (2d Cir 1996)...................................................29

iv

Moorhead v. Farrelly, 723 F. Supp. 1109 (D.V.I. 1989) ........................................................13, 19

Moyer v Peabody, 212 US 78 (1909) .........................................................................................12, 15

Myers v Potter, 422 F3d 347 (6th Cir 2005)..................................................................................23

Pabon v Wright, 459 F3d 241 (2d Cir 2006) .................................................................................24

Palko v. Connecticut, 302 U.S. 319 (1937) ...................................................................................4

Pembaur v City of Cincinnati, 475 US 469 (1986)........................................................................26

Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley
Inv. Mgmt. Inc., 712 F.3d 705 (2d Cir. 2013) ...............................................................................3

People v Kearse, 56 Misc 2d 586 (NY City Ct 1968) ..................................................................6

Portelos v Hill, 719 Fed Appx 37 (2d Cir 2017)...........................................................................26

Pyke v Cuomo, 258 F3d 107 (2d Cir. 2001)..............................................................................31, 32

Raza v City of New York, 998 F. Supp. 2d 70 (E.D.N.Y. 2013) ..................................................32

Qutb v Strauss, 11 F3d 488 (5th Cir. 1993)..................................................................................6

Ramos v Town of Vernon, 353 F3d 171 (2d Cir 2003).........................................................*Passim*

R.C. Diocese of Brooklyn v Cuomo, 141 S Ct 63 (2020) ......................................................*Passim*

Reno v Flores, 507 US 292 (1993) .............................................................................................4, 13

Republican Party of Minnesota v White, 416 F3d 738 (8th Cir 2005)...........................................7

Rodriguez v City of Los Angeles, 2015 WL 13308598 (CD Cal Aug. 11, 2015)..........................5

Roe v Wade, 410 US 179 (1973) ...............................................................................................4-5

Rossini v Ogilvy & Mather, Inc., 798 F2d 590 (2d Cir 1986)......................................................34

Santiago v Miles, 774 F Supp 775 (W.D.N.Y. 1991)...................................................................34

S. Bay United Pentecostal Church v. Newsom, 959 F.3d 938 (9th Cir 2020)......................*Passim*

Scheuer v. Rhodes, 416 U.S. 232 (1974)......................................................................................20

Schleifer v City of Charlottesville, 963 F Supp 534 (WD Va 1997).............................................6

Schoolcraft v. City of New York, 2012 WL 3960118 (S.D.N.Y. Sept. 10, 2012) .........................3

Sharette v Credit Suisse Intern., 127 F Supp 3d 60 (S.D.N.Y. 2015)..............................................30

Smith v Avino, 91 F3d 105 (11th Cir 1996).......................................................................13, 18, 19

Sowell v Northrop, 820 F Supp 2d 475 (W.D.N.Y. 2011) ...........................................................27

State v Dobbins, 277 NC 484 (1971).............................................................................................14

Sterling v Constantin, 287 US 378 (1932)...............................................................12, 15, 16

Thompson v Cope, 900 F3d 414 (7th Cir 2018)............................................................................22

Townes v City of New York, 176 F3d 138 (2d Cir 1999)..............................................................27

United States v Carolene Products Co., 304 US 144 (1938) .........................................................12

United States v. Chalk, 441 F.2d 1277 (4th Cir. 1971) ........................................................*Passim*

United States v City of New York, 683 F Supp 2d 225 (E.D.N.Y. 2010)......................................34

Vega v Semple, 963 F3d 259 (2d Cir 2020) ..................................................................................22

Vil. of Arlington Hgts. v Metro. Hous. Dev. Corp., 429 US 252 (1977) ......................................34

Vision for Children, Inc. v City of Kingston, New York, 2017 WL 9249665 (N.D.N.Y. June 7, 2017) ..................................................................................................................................18

Wallace v Kato, 549 US 384 (2007)................................................................................................5

Williams v Smith, 781 F2d 319 (2d Cir 1986) ..............................................................................29

Williams v Town of Greenburgh, 535 F3d 71 (2d Cir 2008) .................................................*Passim*

WWBITV, Inc. v Vil. of Rouses Point, 589 F3d 46 (2d Cir 2009) ...............................................15

Xavier Becerra Culinary Studios, Inc. et al. v. Newsom, et al., 2021 WL 427115 (ED Cal Feb. 8, 2021) ..................................................................................................................................13

Yang v Dept. of Educ. of the City of New York, 2016 WL 4028131, at *9 (E.D.N.Y. July 26, 2016) ..................................................................................................................................33

Plaintiffs respectfully submit this Memorandum of Law in Opposition to defendant Cuomo, and defendants de Blasio and the City of New Yorks' (collectively "City defendants")[1] respective motions to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

For this Court to validate defendants' week-long, nighttime lockdown of millions of individuals prior to any factual discovery would be unprecedented. Nevertheless, this is precisely what defendants contend is warranted as a matter of law. In support, they postulate a virtually unreviewable standard of governmental deference, which would essentially constitutionalize *any* governmental action – without regard to the rights at issue – as long as it was taken in "*good faith*" and there was "*some* factual basis" to believe that it was "necessary to maintain order."

However, this constitutionally repugnant proposition – namely, that during a governmentally declared state of emergency, traditional tiers of constitutional scrutiny are discarded in favor of essentially unfettered governmental discretion – has never been accepted by the Supreme Court or this Circuit. Moreover, even under the erroneous rule that defendants propound, granting their motions at this stage would require this Court to weigh evidence, make credibility determinations, and otherwise resolve factual disputes in contravention of the Federal Rules. Simply put, the Curfew in this case, which infringed upon the fundamental rights of millions, would never withstand the normal level of constitutional scrutiny required for such an act, and therefore, defendants' exceptional request for a judicial rubber-stamp of their actions must be denied.

---

[1] While the City is a separate defendant in this case, the City sits sidecar to defendant de Blasio as a movant and makes no independent argument for dismissal apart from the purported constitutionality of the Curfew itself.

## STATEMENT OF FACTS

The facts giving rise to this action are set forth in detail within the Complaint. Therefore, plaintiffs do not intend to repeat their full recitation here. It is enough to say that all of the claims asserted in this action arise solely from the implementation and enforcement of the Emergency Executive Orders issued on June 1, 2020, and on June 2, 2020 (hereinafter "Orders," "Curfew Orders," or "Curfew"). These Orders imposed a mandatory Curfew, which with virtually no exceptions, relegated the entire population of New York City – approximately eight million residents – to house arrest from the hours of 8:00 p.m. to 5:00 a.m. for an entire week.[2] While the Curfew Orders were in effect, it was a Class B misdemeanor for anyone in the City to set foot in public unless they were members of law enforcement, first responders, "individuals traveling to and from essential work *and performing* essential work, people experiencing homelessness *and without access to a viable shelter*, and individuals seeking medical treatment or medical supplies." (See the Curfew Orders, attached as **Exhibits C & D** to the Declaration of Edward Murray in support of the City defendants' motion to dismiss).

On June 26, 2020, the named plaintiffs, who are alleged to have committed no other violation of the law apart from being outside of their homes, filed the instant action under 42 U.S.C. § 1983, on behalf of themselves and those similarly situated,[3] claiming that the acts of defendant Cuomo and the City defendants (collectively "defendants"),[4] in implementing,

---

[2] As set forth in the complaint, on June 1, 2020 the period of Curfew enforcement was from 11 p.m. to 5 a.m. Thereafter, beginning on June 2, 2020, the period of Curfew enforcement was from 8 p.m. to 5 a.m. until the day that the Curfew was lifted on June 7, 2020.

[3] As this Court is aware, the Complaint is a putative class action, however, since this fact is neither relevant to any of defendants' arguments in favor of dismissal, nor do they claim it to be, the particular definition or parameters of the proposed class/subclasses are not discussed herein.

[4] While defendant Cuomo alleges that this case involves "a broad array of defendants" (Cuomo Motion to Dismiss, at pg. 2), the "John Doe" defendants only serve "as [] placeholder defendant[s]" because plaintiffs are not aware of the identity of any other individuals responsible or whether there is any responsibility outside of the defendants already named herein. Abreu v City of New York, 657 F Supp 2d 357, 363 (E.D.N.Y. 2009). Accordingly, Cuomo, de Blasio, and the City of New York are the only defendants at this time.

ordering, and enforcing the Curfew violated their rights under the First, Fourth, Fifth, and Fourteenth Amendments of the United States Constitution. On December 10, 2020, defendants separately moved for dismissal pursuant to FRCP 12(b)(6). Since all defendants make the same shared arguments at the outset of their respective briefs, and since these shared arguments are invalid for identical reasons having almost nothing to do with the particular defendant, plaintiffs' brief addresses these shared arguments together in Sections I-IV. Following that discussion, the brief then addresses the sole remaining contention put forth exclusively by defendant Cuomo with respect to the Equal Protection Claim in Section V.

## MOTION TO DISMISS STANDARD

It is well settled that to withstand a motion to dismiss, the plaintiffs need only "'plead facts sufficient to give rise to a plausible *inference*'" that they are entitled to relief. Little v. City of N.Y., 2014 WL 4783006, *2 (S.D.N.Y. Sept. 25, 2014). Similarly, all of the facts pled are entitled to a *presumption of truth* and "*all reasonable inferences*" drawn therefrom must be construed in *plaintiff's* favor. Schoolcraft v. City of New York, 2012 WL 3960118, at *4 (S.D.N.Y. Sept. 10, 2012). Therefore, even where the causes of action are "based solely on *circumstantial* factual allegations," if the allegations nevertheless "permit the court to *infer* more than the *mere possibility* of misconduct," the claims must proceed. Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc., 712 F.3d 705, 727 (2d Cir. 2013). "[I]n deciding a 12(b)(6) motion," it is "improper" for any party to "ask[] [a court] to 'weigh the evidence.'" Boudreau v Smith, 2018 WL 4426010, at *6 (D. Conn. Sept. 17, 2018).

## ARGUMENT

## I. DEFENDANTS CANNOT ESTABLISH THE CONSTITUTIONALITY OF THE CURFEW ORDERS AT THIS STAGE OF THE LITIGATION

It is now academic that governments are "forbid[den]," from "infring[ing] [upon] certain 'fundamental' liberty interests *at all,* no matter what process is provided, unless the infringement is *narrowly tailored* to serve a compelling state interest." Reno v Flores, 507 US 292, 301-02 (1993). In other words, where legislation or governmental action "burdens a group's exercise of a fundamental right," there is no question that "[a] heightened level of review – strict scrutiny – applies." Ramos v Town of Vernon, 353 F3d 171, 175 (2d Cir 2003).

### A. The Curfew Must Pass Strict Scrutiny Review Because It Infringed upon the Fundamental Rights of Millions of Individuals

It has long been settled that "the freedom to loiter for innocent purposes is part of the 'liberty' protected by the Due Process Clause of the Fourteenth Amendment." City of Chicago v Morales, 527 US 41, 53-54 (1999). In fact, the "freedom to leave one's house and move about at will" is viewed as being part of "'the very essence of a scheme of ordered liberty.'" Bykofsky v Borough of Middletown, 429 US 964, 964-65 (1976)(Marshall, J., dissenting)(citing Palko v. Connecticut, 302 U.S. 319, 325 (1937)). Therefore, there is no question that "the right to travel between states" and the "correlative constitutional right to travel within a state" are both "fundamental precept[s] of personal liberty." King v New Rochelle Mun. Hous. Auth., 442 F2d 646, 648 (2d Cir. 1971); accord Campbell v Westchester County, 1998 WL 788791, at *1 (S.D.N.Y. Nov. 10, 1998)("[t]he Second Circuit has treated violations of the constitutional right to interstate and intrastate travel the same, finding both to be fundamental rights and subjecting violations of either to strict scrutiny."). Equally "fundamental" is the right be free from "'unreasonable searches and seizures'" and arrests in the absence of "'probable cause'" under the

4

Fourth Amendment. <u>Roe v Wade</u>, 410 US 179, 211-12 (1973). This is true whether the arrest or seizure occurs "in a common prison or in a private house," because under Fourth Amendment "[e]very confinement of the person is an imprisonment," such that even "when a man is lawfully in a house, it is imprisonment to prevent him from leaving." <u>Wallace v Kato</u>, 549 US 384, 388-89 (2007).

From these principles, the Second Circuit has concluded that a curfew – which prohibits individuals from exercising any freedom of movement outside of their homes and commits them to house arrest[5] prior to any probable cause determination – can only survive a constitutional challenge if it passes strict scrutiny. <u>See</u> <u>generally</u> <u>Ramos v. Town of Vernon</u>, 353 F.3d 171 (2d Cir. 2003). Specifically, in <u>Ramos</u>, during the course of determining the constitutionality of a juvenile curfew, the Second Circuit recognized that while a *juvenile* curfew would be subject to *intermediate* scrutiny because a juvenile's fundamental right to travel "is narrower than an adult's right to free movement," a curfew "applied to *adults* [] would be subject to *strict* scrutiny." <u>Id</u>. at 176 (emphasis added). Moreover, in <u>Williams v Town of Greenburgh</u>, 535 F3d 71 (2d Cir 2008), the Second Circuit reaffirmed exactly what "[it] explained in <u>Ramos</u>" – namely, "that because the curfew in question 'limit[ed] the constitutional right to free movement within the [t]own ...were this ordinance applied to adults, it would be subject to strict scrutiny.'" <u>Williams</u>, 535 F3d at 75 (citations omitted).

In addition, courts in other states and circuits have also agreed that strict scrutiny is the proper standard of review for *any adult* curfew. <u>See</u>, <u>e.g.</u>, <u>Embry v City of Cloverport, KY</u>, ,

---

[5] While the Second Circuit's decision in Ramos was "focus[ed] particularly on [the] claim that the curfew ordinance violate[d] the Equal Protection Clause of the Fourteenth Amendment" (<u>Ramos</u>, 353 F3d at 174), the Supreme Court has established that confinement to one's home under threat of arrest – as required by the Curfew – *also* implicates the fundamental rights of the Fourth Amendment as well. <u>See Wallace</u>, 549 U.S. at 388-89; <u>accord Rodriguez v City of Los Angeles</u>, 2015 WL 13308598, at *13 (CD Cal Aug. 11, 2015) (Recognizing that "confinement to one's home under threat of arrest" in connection with a curfew order "constitutes false imprisonment.").

2004 WL 191613, at *2 (WD Ky Jan. 22, 2004)(finding that even a curfew containing many exceptions not present in this case still "must be narrowly tailored to achieve a compelling goal"); Gaffney v City of Allentown, 1997 WL 597989, at *5 (ED Pa Sept. 17, 1997)(subjecting the curfew to strict scrutiny, and noting that in doing so it was "joined by every other federal court that has recently reviewed a curfew"); Cole v City of Memphis, 97 F Supp 3d 947, 960-61 (WD Tenn 2015)(finding strict scrutiny applicable to a regulation that "broadly denies individuals in the area access to the public roadways"); Schleifer v City of Charlottesville, 963 F Supp 534, 543 (WD Va 1997)(strict scrutiny); Qutb v Strauss, 11 F3d 488, 492 (5th Cir 1993)(strict scrutiny).

Based on the foregoing, there can be no question that the Orders here, which constituted a "total prohibition of *all* persons without exception from *all* of the streets of the city, unduly infringe[d] upon fundamental rights," by "mak[ing] it a crime to do something which is innocent in itself." People v Kearse, 56 Misc 2d 586, 593-94 (NY City Ct 1968). As a result, there is simply "no doubt" that the Curfew must "be subject to strict scrutiny." Anonymous v City of Rochester, 13 NY3d 35, 45 (2009)(citations omitted). Therefore, whether it is self-servingly described by defendants as "short-lived" (City Defendants' Motion to Dismiss ("City Motion") at 10) or "limited in duration and scope" (Cuomo Motion at 13), or given a more constitutionally accurate description of being "draconian," and "represent[ing] a particularly sweeping restriction on the right to free movement, requiring a person to remain in a confined area for long periods of the day or night" (Com. v Weston W., 455 Mass 24, 33-34 (2009)), it is clear that the Curfew must pass strict scrutiny review in order to survive.

i. **The Curfew in this Case Could Never Survive Strict Scrutiny at this Stage of the Litigation**

Under a strict scrutiny analysis, defendants must establish that the Orders were necessary to "serve a 'compelling' governmental interest," were "precisely tailored to serve that interest," *and* that they were "the least restrictive means readily available for that purpose." Hobbs v County of Westchester, 397 F3d 133, 149 (2d Cir 2005). To be sure, "[s]trict scrutiny is an exacting inquiry, such that 'it is the rare case in which...a law survives.'" Republican Party of Minnesota v White, 416 F3d 738, 749 (8th Cir 2005). As a result, it is no wonder why the late Justice Thurgood Marshall believed that "a curfew aimed at all citizens could not survive constitutional scrutiny," even if it would serve to "protect those subject to it from injury and prevent them from causing 'nocturnal mischief.'" Bykofsky, 429 US at 965 (Marshall, J., dissenting). However, even assuming that an adult curfew *could* satisfy strict scrutiny in the appropriate circumstance, this is simply not that circumstance.

Specifically, without repeating every relevant factual recitation in the complaint, numerous allegations establish: 1) that the protests were overwhelmingly peaceful; 2) that any criminality was extremely scattered and isolated, involving predominantly petty offenses; 3) that defendants prematurely issued the Curfew without regard to its necessity or efficacy, and, 4) that the scope and severity Curfew was not balanced with – or tailored to – the goals it was purportedly designed to achieve. Further, these allegations are supported by defendants' statements and those of NYPD Commissioner Shea.[6] Indeed, in the days leading up to the

---

[6] It is well settled that "[t]he Court may take judicial notice of the press releases of government agencies." McLoughlin v. People's United Bank, Inc., 586 F.Supp.2d 70, 73 (D. Conn. 2008)(citations omitted); accord Mitchell v. Home, 377 F.Supp.2d 361, 367 n.1 (S.D.N.Y. 2005) ("The press release [from the New York Attorney General] may be considered on this motion to dismiss because ... this Court may take judicial notice of it as a matter of public record[.]"). Moreover, defendants' motions concede that all of defendants' public statements regarding the Curfew, including those of NYPD Commissioner Shea, are all incorporated by reference into the pleadings. (See City Motion at 12).

Curfew, defendants repeatedly emphasized the comparatively small amount of protesting activity

that was occurring:

> "remember how few people have been protesting compared to the over eight
> million people who live here."

Defendants also highlighted the small amount of violence occurring within the already small

amount of protest activity compared to the massive population of New York City:

> "what we have seen, again, a small number of people, in the scheme of things,
> protesting to begin with, very few of whom committed acts of violence;"

> "[in] [a] city of over 8 million people and a few thousand people were protesting
> and within that a very small number literally and specifically meant to incite
> violence;"

> "there's over eight million people in the city, and the people who are out right
> now, number in the hundreds."

And, defendants never equivocated that the violence and looting was extremely rare and isolated:

> "it's *quite clear* that a *small* number of them aim to do violence and are being
> addressed;"

> "there are a *very small* number of people doing this violence. *Very small*;"

> "[a]gain, that phenomenon, [was] *rare*…[and was] being fomented by a *very
> small* number of violent protesters." [7]

And, defendants believed that the NYPD had the ability and resources to handle whatever

amount of criminality that was occurring without the need for the Curfew:

> "I don't know that it's a person power issue in New York City, in Minneapolis it
> was a person power, they just don't have a police force large enough to handle it,

---

[7] The statements referenced herein were made by Mayor de Blasio and Commissioner Shea at the press briefings occurring on May 30th, May 31st, and June 1st. See "Transcript: Mayor de Blasio, Police Commissioner Shea Hold Media Availability, May 30, 2020," *available at* https://www1.nyc.gov/office-of-the-mayor/news/387-20/transcript-mayor-de-blasio-police-commissioner-shea-hold-media-availability (last visited February 3, 2021); "Transcript: Mayor de Blasio, Police Commissioner Shea Hold Media Availability, May 31, 2020," *available at* ; https://www1.nyc.gov/office-of-the-mayor/news/388-20/transcript-mayor-de-blasio-holds-media-availability (last visited February 3, 2021); "Transcript: Mayor de Blasio, Police Commissioner Shea Hold Media Availability, June 1, 2020,"" *available at* https://www1.nyc.gov/office-of-the-mayor/news/393-20/transcript-mayor-de-blasio-holds-media-availability (last visited February 3, 2021).

I don't know that that is the situation, I don't know that the NYPD isn't big enough, I don't think that's the problem."[8]

Finally, and perhaps most damning, on the very same morning that the Curfew was issued, the NYPD Commissioner emphatically expressed his belief that any curfew imposed *would not work*, and in fact, forcefully declared that if *anyone* was even *entertaining* a belief that a curfew *could* work, "they d[id]n't understand what's going on." See NYPD Commissioner on Today, *available at* https://www.today.com/video/nypd-commissioner-dermot-shea-when-it-got-dark-it-got-ugly-quick-84168261960 (last visited February 3, 2021).

In sum, given that both the allegations in the complaint as well as the statements of defendants and the City's highest-ranking law enforcement officials clearly call into question both the necessity and utility of the Curfew, defendants' conclusory assertions that the Curfew was "reasonable and narrowly tailored" (Cuomo Motion at 16; City Motion at 15(n.9)), "to maintain public order and peace" (id.), "[and] to protect New Yorkers and their businesses" (Cuomo Motion at 16), cannot possibly satisfy the exacting strict scrutiny standard. Accordingly, "[i]n light of the paucity of support for the City's argument" that Curfew was necessary to "protect[] the rest of society by significantly reducing crimes," and their correlative inability to "demonstrate the required tight nexus between the City's goal of reducing [] crime and the curfew," there is simply no chance that the Curfew could survive strict scrutiny at this stage – let alone ever. See, e.g., Gaffney, 1997 WL 597989, at *8 (invalidating a curfew under strict scrutiny).[9]

---

[8] "Cuomo Daily Briefing for June 1, 2020," *available at* https://www.cnbc.com/2020/06/01/new-york-gov-cuomo-weighs-curfew-for-new-york-city-has-national-guard-on-standby-amid-george-floyd-protests.html (last visited February 3, 2021).

[9] Even assuming arguendo that defendants could establish a sufficient factual predicate to withstand strict scrutiny, it is "difficult to discern based on the record before the Court at the Motion To Dismiss stage," how defendants could plausibly argue – or how this Court could resolve – the issue of "how the important government interest at stake fits with the challenged regulation absent more evidence on either question." Doe No. 1 v Putnam County, 344 F Supp 3d 518, 538 (S.D.N.Y. 2018); see also Ho by Ho v San Francisco Unified School Dist., 965 F Supp 1316, 1325 (ND

### B.  There is No Support Under Existing Law to Support the Notion that Fundamental Rights Are Diminished in an Emergency

While the Second Circuits' decisions in <u>Ramos</u> and <u>Williams</u>, and Justice Marshall's opinion in <u>Bykofsky</u> certainly seem relevant – if not controlling – on the proper standard under which to evaluate the Curfew Orders, they are conspicuously absent from defendants' briefs.[10] This is because, according to defendants, these decisions and the standards articulated therein are applicable *only* in the context of "nonemergency curfew[s]." (City Motion at 10(fn.5)); (Cuomo Motion at 14). By contrast, defendants assert that in emergency curfew cases, a different standard applies, one that "gives the most extraordinary deference to the State's police powers." <u>Bayley's Campground Inc. v Mills</u>, 463 F Supp 3d 22, 31 (D Me 2020), <u>reconsideration denied,</u> 2020 WL 3037252 (D Me June 5, 2020), and <u>affd,</u> 2021 WL 164973 (1st Cir Jan. 19, 2021). In other words, according to defendants, the simple fact that the Curfew Orders in this case *also* contain a *simultaneous* declaration of emergency transforms a governmental act that would otherwise be subject to the *highest* level of judicial examination, into one that "barely authorizes judicial review at all," and in fact, is "the opposite of strict judicial scrutiny." <u>Id</u>. This is plainly wrong, as there is no constitutional jurisprudence that "supports cutting the Constitution loose during a[n] [emergency]" (<u>R.C. Diocese of Brooklyn v Cuomo</u>, 141 S Ct 63, 70 (2020) (Gorsuch, J., concurring)), or that "supports the view that an emergency *displaces* normal

---

Cal 1997) (recognizing that the question of whether a law "is sufficiently 'narrowly tailored' to achieve its goals and survive strict scrutiny, rests on factual issues"). Accordingly, at minimum, factual disputes would preclude resolution of this issue at this stage.

[10] The City defendants' brief is completely devoid of reference to <u>Ramos</u> or <u>Williams</u>, and contains only a single reference to <u>Bykofsky</u> within a footnote. Likewise, defendant Cuomo's brief references <u>Ramos</u> and <u>Bykofsky</u> in separate footnotes, with no mention of <u>Williams</u>.

constitutional standards" (<u>S. Bay United Pentecostal Church v. Newsom</u>, 959 F.3d 938, 942 (9th Cir 2020)(Collins, J., dissenting).[11]

### i. There has Never Been an "Emergency Exception" to Constitutional Rights or to the Modern Tiers of Constitutional Scrutiny

Defendants contend that in order to validate the Curfew in this case, they need *only* show that their "actions were taken in *good faith*" and that there was "*some* factual basis" for their decision that "the restrictions [] imposed were necessary to maintain order." (Cuomo Motion at 12; City Motion at 5). While defendants derive this standard almost exclusively from errant, outer circuit decisions (<u>see</u> Section I.B.ii, <u>supra</u>), similar attempts to manifest a good faith emergency exception have relied on the Supreme Court's turn of the century decision in <u>Jacobson v Commonwealth of Massachusetts</u>, 197 US 11, 31 (1905).[12] However, as Justice Gorsuch recently recognized, neither <u>Jacobson,</u> nor any other case, has ever established any such emergency exception; and, courts that have "mistaken" that decision "for a towering authority that overshadows the Constitution during [an emergency]" because of "a particular judicial impulse to stay out of the way in times of crisis," are simply incorrect. <u>R.C. Diocese</u>, 141 S Ct at 71 (Gorsuch, J., concurring).

As a preliminary matter, the most obvious distinction between <u>Jacobson</u> and the present case is that <u>Jacobson</u> involved the constitutionality of mandatory smallpox vaccinations – and not a curfew. While there are veiled references to COVID-19 peppered throughout defendants' briefs, any suggestion that curbing the spread of coronavirus provided an alternative rationalization for the Curfew is a red herring. Specifically, by now it is beyond debate that: 1)

---

[11] While this and other citations throughout this brief refer to the dissenting opinion of the Ninth Circuit's decision in <u>S. Bay</u>, <u>supra</u>), given the strikingly similar analysis and conclusion reached by Justice Gorsuch's in his concurrence in <u>R.C. Diocese</u>, 141 S Ct at 69, it appears as though Collins' dissent was correct from the outset.

[12] <u>See</u>, <u>e.g.</u>, <u>S. Bay</u>, 959 F3d at 942 (discussing a similar characterization of "*Jacobson*'s 'highly deferential' standard of review" as one where courts "are supposedly limited 'to a determination of whether the [Governor's] actions were taken in good faith and whether there is some factual basis for [the] decision.'").

physical proximity contributes to the spread of the virus; 2) that the amount and concentration of protesters during the *day* was *far greater* than it was at *night*; 3) that a curfew has never been imposed – before or since the Orders in this case – in response to COVID-19 even when cases were at their *highest*; and, 4) that at the time of the Curfew, cases of COVID-19 were at their *lowest*. Thus, any suggestion that the Curfew, which had never before been deemed necessary to stop the virus – even at a time when it was at its worst – could somehow *now* be rationally connected to curbing COVID-19 at a time, and during a time of day, when both cases of the virus and the risk of spreading it were at their *lowest*, defies logic and reason.

More important than this factual distinction, however, are the points of law that render Jacobson inapplicable or simply erroneous. First, as the concurrence in R.C. Diocese pointed out, Jacobson involved "an entirely different right, [] an entirely different kind of restriction," and therefore "an entirely different mode of analysis," than would be applicable here. R.C. Diocese, 141 S Ct at 70. Indeed, unlike the fundamental rights affected by the Curfew here, in Jacobson "the challenged law survived *only* because it *did not* 'contravene the Constitution of the United States' *or 'infringe any right* granted or secured by that instrument.'" Id. at 71. As a result, the Jacobson Court simply applied rational basis review, which is the test "*normally* applie[d] to Fourteenth Amendment challenges, so long as they do not involve…a claim of *fundamental right*." Id. at 70. Moreover, even if Jacobson could be read as applying a different standard of review, the fact remains that Jacobson – like Moyer and Sterling (discussed in Section I.B.ii, infra) – "pre-dated the modern tiers of scrutiny." Id.[13] In other words, at the time of Jacobson, the now unquestionable constitutional axiom that any governmental restriction infringing on

---

[13] The first reference to what has come to be known as the modern tiers of judicial scrutiny appeared in a Footnote of Supreme Court's decision in United States v Carolene Products Co., 304 US 144 (fn.4) (1938).

upon fundamental rights must pass strict scrutiny (Leebaert v. Harrington, 332 F.3d 134 (2d Cir 2003); Reno, supra) had not yet been firmly settled.

In sum, there is simply no authoritative jurisprudence that would endorse the preposterous claim that during any alleged emergency, governments have "a rubber stamp for all but the most absurd and egregious restrictions on constitutional liberties, free from the inconvenience of meaningful judicial review." Bayley's Campground Inc., 463 F Supp 3d at 32. Stated differently, just as "there is no world in which the Constitution tolerates color-coded executive edicts that reopen liquor stores and bike shops but shutter churches, synagogues, and mosques" (R.C. Diocese, 141 S Ct at 72), there should similarly be no world in which the Constitution tolerates the infringement upon the fundamental rights of millions where neither the facts on the ground nor the belief of highest-ranking officials supported the necessity or efficacy of the Curfew.

### ii. The Non-Binding Outer Circuit Decision in Chalk Does Not Support the Existence of an Emergency Exception to Constitutional Standards

Notwithstanding the fact that R.C. Diocese reaffirmed what was already clearly established – namely, that an "emergency does not give rise to an alternative standard of review"[14] – defendants nevertheless offer the Fourth Circuit decision in United States v. Chalk, 441 F.2d 1277 (4th Cir. 1971), and its few scattered progeny, to support the exact same proposition.[15] In other words, to constitutionally uphold the Curfew in this case, this Court must

---

[14] Xavier Becerra Culinary Studios, Inc. et al. v. Newsom, et al., 2021 WL 427115, at *12 (ED Cal Feb. 8, 2021)(recognizing the implications of R.C. Diocese).

[15] Although defendants cite to several other outer circuit decisions in support of this standard of review, most of these decisions – despite their validation of the particular curfews therein – either cite Chalk as the originating precedent for the "good faith" standard or articulate no standard of review whatsoever. See, e.g., Bright v Nunn, 448 F2d 245 (6th Cir 1971)(upholding a curfew with no articulated standard of review); Ervin v State, 41 Wis 2d 194, 200 (1968) (upholding a curfew with no articulated standard of review). Smith v Avino, 91 F3d 105, 107 (11th Cir 1996)(citing Chalk); Moorhead v.Farrelly, 723 F. Supp. 1109 (D.V.I. 1989)(citing Chalk); In re Juan C., 28 Cal App 4th 1093, 1101 (Cal Ct App 1994)(citing Chalk but evaluating the curfew based on whether it was "reasonably

ignore the guidance of R.C. Diocese and all relevant Second Circuit precedent, and accept Chalk as the sole and conclusive authority on the issue of the constitutional standard under which to evaluate curfews. However, neither Chalk, nor the cases upon which it relies, supports the "notion that the existence of an emergency results in a wholesale displacement of conventional constitutional standards." S. Bay, 959 F3d at 943.

As an initial matter, the Chalk decision itself belies any contention that typical constitutional standards are set aside in a time of an emergency – or an alleged emergency. Specifically, in the paragraph immediately preceding the quotation plucked by defendants, the Fourth Circuit recites the standard applicable to "regulation[s] of conduct ha[ving] an incidental effect on speech" – namely, that those restrictions "on First Amendment freedoms can be no greater than is essential to the furtherance of the government interest which is being protected." Chalk, 441 F2d at 1280-81. If this standard sounds familiar, that is because it is the standard for intermediate scrutiny, which is always applied to content-neutral speech restrictions. See, e.g., Cablevision Sys. Corp. v F.C.C., 570 F3d 83, 97 (2d Cir 2009) (in applying intermediate scrutiny and determining whether the order "burden[s] substantially more speech than necessary to further these interests."). A fortiori, Chalk's reference to this standard appears to signify that the court there was not articulating a *different* standard of review in which to apply to emergency curfews, but rather "attempt[ing] to fit its comments" – albeit clumsily – "within such *existing* First Amendment categories" by "liken[ing]" the curfew to "a time, place, and manner restriction," which has *always* been analyzed under intermediate scrutiny.[16]   S. Bay United, 959

---

related to a compelling government interest"); State v Dobbins, 277 NC 484, 490 (1971)(a criminal appeal based on the same curfew ordinance as was the subject of the 4th Circuit decision in Chalk).

[16] While it is altogether unclear why the Fourth Circuit chose to cabin its analysis of the curfew solely to a First Amendment time place and manner restriction, thereby implicating only intermediate scrutiny review, this only illustrates the inapplicability of Chalk in light of the body of caselaw that has developed since, which has recognized a curfew's effect on *other* fundamental rights derived from the Fourth and Fourteenth Amendments and which require a heightened standard of review.

F3d at 943. Accordingly, <u>Chalk</u>'s "discussion of the First Amendment undercuts" (<u>id.</u>) the idea that it was meant to create a *separate* constitutional standard of review for all governmental actions taken during emergencies, no matter the right affected.[17]

### C. Even Under Defendants' Erroneous Standard of Review, the Curfew Orders Cannot be Constitutionally Validated at this Time

Notwithstanding the legal infirmity of defendants' extraordinary claim that judicial review is limited during an emergency, even assuming *arguendo* that a separate standard of constitutional review – or non-review – did apply in an emergency, the *existence* of a genuine emergency would still be an essential prerequisite to the application of such a standard. However, the question of whether "a genuine emergency exists is a factual issue subject to the usual considerations for a district court addressing a [motion to dismiss]." <u>WWBITV, Inc. v Vil. of Rouses Point</u>, 589 F3d 46, 51 (2d Cir 2009). Therefore, because the Second Circuit has repeatedly "emphasized" that "the existence *vel non* of an emergency [] is a material fact," dismissal is "improper [where] there was a genuine dispute about whether an emergency existed." <u>Id</u>. at 50 (citing <u>Burtnieks v City of New York</u>, 716 F2d 982, 988 (2d Cir 1983)).

---

[17] The cases cited to by the court in <u>Chalk</u> as supporting the quoted language – <u>i.e.</u>, <u>Moyer v Peabody</u>, 212 US 78 (1909) and <u>Sterling v Constantin</u>, 287 US 378 (1932) – are also unavailing in providing a distinct standard of constitutional review applicable to emergencies. For example, the Court's 100 year-old decision in <u>Moyer</u> was a jurisdictional question in which the Court declined to review a governor's act of imprisoning an individual without habeas process during an *undisputed* "state of insurrection" because that decision was made "in good faith, in the course of putting the insurrection down." <u>Moyer</u>, 212 US at 84. Accordingly, as the Supreme Court subsequently explained, "the general language of the [Moyer] opinion must be taken in connection with the point actually decided," which in that case was the question of whether "the action of the Governor had direct relation to the subduing of the insurrection by the temporary detention of one believed to be a participant." <u>Sterling</u>, 287 US at 378. Likewise, the Court's decision in <u>Sterling</u> – also cited to by <u>Chalk</u> – also provides no support for such a rule. In fact, the <u>Sterling</u> Court made it clear, "[e]very case must depend on its own circumstances," and that its decision was not "concerned with the permissible scope of determinations of military necessity in all their conceivable applications to actual or threatened disorder and breaches of the peace." <u>Id</u>. at 401. Thus, neither an examination of <u>Chalk</u> nor its legal underpinnings lend support to the idea that constitutional norms are suspended during an emergency.

i. *The Allegations in the Complaint and Defendants' Own Public Statements Clearly Create Factual Issues Surrounding the Existence of a Genuine Emergency as well as the Necessity and Utility of the Curfew*

Although defendants assert – rather disingenuously – that the Curfew can be upheld because "plaintiffs do not contest" (Cuomo Motion at 13) and "do not purport to dispute the existence of an emergency" (City Motion at 7), this is simply false. While plaintiffs cannot dispute that defendants simultaneously *declared* a second state of emergency[18] in order to justify the Curfew, any argument that the declaration itself "can be taken as conclusive proof of its own necessity," in the face of conflicting evidence, "has no support," and in fact, "the contrary is well-established" under the law. <u>Sterling</u>, 287 US at 400-402. Likewise, the declaration of a state of emergency *also* "does not address whether the state of emergency *necessitated*" a curfew with the breadth, scope, and duration of the Curfew in this case. <u>DeBari v Town of Middleton</u>, 9 F Supp 2d 156, 162 (N.D.N.Y. 1998)(emphasis added). In other words, simply because defendants say an emergency existed, or say that emergency measures were necessary, does not make it so absent discovery.

Alternatively, to the extent that defendants are arguing that the current record before the Court raises no such disputes, this is a much more dubious claim. In particular, the complaint is replete with allegations – both explicit and inferential – that the Curfew was neither appropriate nor justified by the circumstances. Indeed, it contains allegations that the curfew was:

- an "unprecedented" measure taken "in response to three days of overwhelmingly non-violent protesting and demonstration" (Complaint at ¶17);

- that "generic claims of 'act[s]'of assault, vandalism, property damage, and/or looting committed by 'some persons' in a city of millions during demonstrations involving tens of thousands–which defendants admittedly were overwhelmingly peaceful –is woefully

---

[18] The dispute in this case pertains to the *additional*, *second* declaration of emergency issued simultaneously within the Curfew Orders. Plaintiffs, do not dispute the existence of a state of emergency related to COVID-19, however, as discussed in Section I.B.i, <u>supra</u>, there is no evidence to rationally connect the Curfew with curbing the spread of COVID-19.

insufficient to justify the blanket confinement, detainment, seizure of millions against their will" (Id. at ¶31);

- that "the extent to which the protest/demonstrations had 'escalated' into criminal behavior was extremely limited" (Id. at ¶30);

- that based on the NYPD's own statistics, "the City as a whole was actually significantly safer during the Floyd Protests then it was during normal times" (Id. at ¶36);

- that "even the language of the Curfew Orders belie[d] the severity and extent of the alleged 'severe endangerment'" that defendants claim necessitated the curfew (Id. at 29); and,

- that it was "constitutionally unnecessary and unjustified under the circumstances [and] overly restrictive and harsh when balanced against the dangers they were purportedly designed to prevent" (Id. at 4);

Moreover, even if this Court were to ignore these allegations – as defendants seem to do – these same stark factual disputes are also demonstrated by the public statements made by defendants at their daily press briefings,[19] which clearly call into question both the necessity of the Curfew, and defendants' good faith belief that there was any factual basis upon which to conclude the imposition of the Curfew would be effective in, or necessary to, maintaining order.[20] Stated differently, these statements – all made in the days and hours immediately preceding the Curfew Orders – suggest, at minimum, that there is "conflicting evidence as to the

---

[19] These specifics of these statements are set forth in Section I.A.i, supra.

[20] While there is no doubt – and defendants have conceded – that judicial notice may be taken of defendants' own undisputed public statements, defendants' veiled attempts to resolve factual disputes regarding the existence of an emergency or the necessity of the Curfew by amassing newspaper articles and other media coverage that seem to support their version of the facts must be rejected. Indeed, it is well-settled in this Circuit that "it is not proper for the Court to take judicial notice of [media coverage]" where the parties offering them "seek to offer them for the truth of their contents, [on] a point of factual dispute that is not properly decided in the Rule 12(b)(6) context." Ayala v Looks Great Services, Inc., 2016 WL 3541548, at *8 (E.D.N.Y. June 23, 2016). This rule is well grounded in the notion that newspaper articles and media accounts suffer from "the classic hearsay dangers of faulty perception, memory, and narration are inherent." Jacobson v Deutsche Bank, A.G., 206 F Supp 2d 590, 596 (S.D.N.Y. 2002), affd, 59 Fed Appx 430 (2d Cir 2003). Thus, since it is the mandate of the media "is to get eyeballs on the screen…focus[ing] on spectacle: fires, people crying, and broken windows," defendants' use of media accounts which portray "property damage and fires are limited to a small area," as something akin to a "city engulfed in flames," is improper. See "What news coverage does — and doesn't — show about unrest in Minneapolis and Louisville," available at https://www.vox.com/first-person/2020/5/29/21274891/george-floyd-cop-arrested-minneapolis-breonna-taylor (last visited February 3, 2021).

severity and urgency of the situation and the motivation of the decision-makers, all of which calls into question the competency of the evidence underlying the decision." See, e.g., Vision for Children, Inc. v City of Kingston, New York, 2017 WL 9249665, at *18 (N.D.N.Y. June 7, 2017). Accordingly, "precluding such a challenge [from plaintiffs]" where factual issues exist surrounding defendants' declaration of an emergency, or the invocation of emergency measures in this case, "would deprive the plaintiffs the opportunity to contest a state's decision to abuse their fundamental rights." Catanzaro v Weiden, 140 F3d 91, 95 (2d Cir 1998), on reh, 188 F3d 56 (2d Cir 1999).

### ii. The Cases Cited in Defendants' Brief Cannot Provide a Legal or Factual Basis for Summarily Upholding the Curfew Absent Discovery

Apart from the evidence and inferences that would preclude judicial approval of the Curfew even under their own incorrect legal standard, defendants nevertheless attempt to whitewash these disputes by citations to a handful of cases which they claim support the proposition that courts have "regularly concluded" (City Motion at 7) that temporary curfews are valid. However, these cases are nothing more than the outer-circuit progeny of Chalk, which as discussed in Section I.B.ii, supra, has been improperly relied upon for a rule/exception that assuredly does not exist. Nevertheless, regardless of their legal infirmities, their *factual* dissimilarities from the present case make them inappropriate guideposts for judging the constitutionality of the Curfew as well.

First, in most of the cases cited by defendants, either "[t]he evidence established *conclusively* that they were confronted with an emergency–a clear and present danger" (Nunn, 448 F2d at 249), or the plaintiffs otherwise "conceded a curfew was necessary when imposed" (Smith 91 F3d at 109). See also Ervin, 41 Wis 2d at 197-98("[t]here is no claim made here that the community situation in the summer of 1967 did not warrant the mayor's use of the power to

declare a curfew"). By contrast, in this case there is *substantial* doubt and dispute regarding the necessity/utility of the Curfew, as evidenced by the allegations and defendants' own statements.

Next, the juxtaposition between the circumstances of these cases and the Curfew here is not even remotely apt. For example, it is a false analogy to compare the Curfew in this case – which abridged the fundamental rights of approximately *eight million* people for 9 hours a day, for an entire week – with the situation in Chalk, which involved a three-night curfew imposed on the less than 60,000 residents of Asheville, North Carolina. See Chalk, supra at 1278; see also Historical Population of Asheville, N.C.," *available at* https://population.us/nc/asheville/ (last visited February 3, 2021). Or, with Nunn, which involved a two-day curfew imposed on the 15,000 students attending the University of Kentucky Campus (Nunn, 448 F2d at 249).

Similarly inapt would be to compare the isolated incidents of looting and the predominantly petty criminality committed by a small number of individuals in this case, with the circumstances in Smith, where Hurricane Andrew had quite literally destroyed large portions of Dade County and left it with a total "lack of electrical power" and "lack of telephone service." Smith, 91 F3d at 109. Or, with Moorhead, where Hurricane Hugo had knocked out power and telephone service on the entire island of St. Croix and even caused "the majority of the island's prison population [to] escape[]." Moorhead, 723 F Supp at 1110.

Finally, is also improper to compare curfews orders in the late 60's and early 70's (Chalk, Nunn, Ervin, supra), occurring before the dawn of modern-day law enforcement in cities that either had minimal police forces or "entirely inadequate police protection" (Am. Civil Liberties Union of W. Tennessee, Inc. v. Chandler, 458 F. Supp. 456, 460 (W.D. Tenn. 1978)), with the situation here, where the 36,000 officers of the NYPD, one of the largest and most sophisticated

para-military organizations in the world, likely outnumbered the protestors – let alone the small number of looters and criminal participants – by the tens of thousands.

Thus, the apparent differences in the types of emergency, the amount of people curfewed, the size and resources of the police force, and the basic realities of the time period in which the curfew was imposed, all serve to highlight the unique factual issues presented in this case that preclude judgment at this time. As such, this Court may not – as defendants argue – simply countenance this Curfew without first resolving these apparent disputes. See, e.g., Scheuer v. Rhodes, 416 U.S. 232, 249-250 (1974):

> In dismissing the complaints, the District Court and the Court of Appeals erroneously accepted as a fact the good faith of the Governor, and took judicial notice that 'mob rule existed at Kent State University.' There was no opportunity afforded petitioners to contest the facts assumed in that conclusion. There was no evidence before the courts from which such a finding of good faith could be properly made…[t]he complaining parties are entitled to be heard more fully than is possible on a motion to dismiss a complaint.
>
> Id.

## II. PLAINTIFFS' FALSE ARREST CLAIMS MUST PROCEED BECAUSE PROBABLE CAUSE TURNS ON THE CURFEW'S CONSTITUTIONALITY

While both defendants here argue that the plaintiffs' arrests were validly based on probable cause to believe that they violated the Curfew, they do not dispute that the sole predicate for probable cause is their conclusion that the Curfew was valid and lawful. (See City Motion at 17; Cuomo Motion at 14). A fortiori, since defendants do not dispute that the validity of probable cause swings on the validity, lawfulness, and constitutionality of the Curfew itself, and it is clear that the Curfew's constitutionality cannot be determined at this stage (see Section

I, supra), judgment on the issue of probable cause and plaintiffs' false arrest claims is also precluded.[21]

## III.   DEFENDANTS MAY NOT AVAIL THEMSELVES TO QUALIFIED IMMUNITY FOR THE DECISION TO IMPOSE THE CURFEW

Following their attempts to convince this Court to apply an erroneous and/or non-existent constitutional standard of review, defendants next claim entitlement to qualified immunity. According to them, qualified immunity is warranted because at the time the Curfew was ordered, it was not yet clearly established under existing law that imposing a curfew on millions of individuals in response to isolated instances of criminality – which they openly believed a curfew would be ineffectual in combating – would be unconstitutional. Although this argument is not particularly surprising given that defendants' entire brief appears to be nothing more than an attempt to set up a straw man argument for qualified immunity by calling into question the otherwise well-settled constitutional standards that would normally apply, "[d]efendants cannot hide behind the shield of qualified immunity by virtue of ambiguities of their own making" (Magni v County of Luzerne, 2018 WL 3978977, at *6 (MD Pa Aug. 20, 2018)) especially where the law is beyond debate at this point.

### A.   It was Clearly Established that Adult Curfews Must be Precisely Tailored to Serve Compelling State Interests and be the Least Restrictive Way to Achieve that Interest

The particular argument made by defendants in favor of qualified immunity – namely, that their actions are protected because there has been no factually analogous case respecting this issue – "echoes a common refrain in qualified immunity cases." Edrei v Maguire, 892 F3d 525, 542 (2d Cir 2018). However, while there is of course no factually comparable curfew to the one

---

[21] Since defendants' motion does not assert that probable cause existed for any of the other millions of individuals subjected to false arrest simply by virtue of the imposition of the Curfew, the class claim for false arrest could similarly not be dismissed absent a finding that the Curfew was constitutional.

in this case, which was imposed on millions of individuals, in one of the largest cities in the world, as "the absence of legal precedent addressing an *identical* factual scenario does *not* necessarily yield a conclusion that the law is not clearly established." Gardner v. Murphy, 613 F. App'x 40, 43 (2d Cir. 2015)(emphasis added). Indeed, if defendants were correct in asserting that factual identity is required before a right can be clearly established, "government actors [would] invariably receive qualified immunity." Golodner v. Berliner, 770 F.3d 196, 206 (2d Cir. 2014). Instead, "[t]he Second Circuit has said that the 'Goldilocks principle,'" which analyzes the right in light of pre-existing law, "illustrates the 'middle course' between the two extremes—not too broad, not too narrow, but just right." Thompson v Cope, 900 F3d 414, 422 (7th Cir 2018)(citing Golodner, supra).

Here, an examination of the right "in the light of pre-existing law," seems to dispense with defendants' claim rather easily. Vega v Semple, 963 F3d 259, 277 (2d Cir 2020). First, in a dissent antedating this case by over forty years, Justice Thurgood Marshall expressed "little doubt" that "a curfew aimed at all citizens could not survive constitutional scrutiny," even if it would serve to "protect those subject to it from injury and prevent them from causing 'nocturnal mischief.'" Bykofsky, 429 US at 965 (Marshall, J., dissenting). Moreover, since that time, the Second Circuit has *twice* reached a similar conclusion, explaining that a curfew "applied to adults," which "limits the constitutional right to free movement within [a locality] at certain hours of the night," "would be subject to strict scrutiny." Ramos, Williams, supra. In addition, district courts in this circuit have also followed suit in finding that a curfew's "infringement of an adult's 'freedom of movement' would implicate strict scrutiny." Inturri v City of Hartford, Conn., 365 F Supp 2d 240, 249 (D Conn 2005), affd sub nom. Inturri v City of Hartford, 165 Fed Appx 66 (2d Cir 2006). In fact, even the state's highest court has expressed "*no doubt*" that a curfew

22

"interfering with the exercise of [the right to travel] would be subject to strict scrutiny." Anonymous, 13 NY3d at 45 (emphasis added).

As a result, it was, at minimum, clearly established that for any curfew to be validly imposed in this circuit or state, constitutional standards required that it be *narrowly tailored* to the compelling need it was designed to achieve, and *also* be the least restrictive means of doing so. Thus, since it seems rather apparent that the Curfew here – which blanketly applied to millions with almost no exceptions and was imposed in response to isolated acts of criminality despite a belief that it was not needed and would not work – did not meet that criteria. Accordingly, defendants' qualified immunity argument must fail, or at best be denied in light of the fact that "[t]he parties' versions of the material facts differ markedly" concerning the Curfew's legitimacy, efficacy, and necessity, which thus "preclude[s] [] judgment on the defense of qualified immunity." Breen v Garrison, 169 F3d 152, 153 (2d Cir 1999).[22]

**B. Defendants Cannot Create Ambiguity in the Law by Referencing Outer Circuit Decisions that have Never Been Accepted by the Second Circuit or the Supreme Court**

It is well settled that for a right to be clearly established, "the Supreme Court or the Second Circuit [must have] recognized the right." Contant v City of New York, 2012 WL 1158756, at *7 (E.D.N.Y. Mar. 16, 2012), report and recommendation adopted, 2012 WL 1165623 (E.D.N.Y. Apr. 9, 2012). Conversely, "[w]hen *neither* the Supreme Court *nor* this court

---

[22] Qualified Immunity may also fail for a separate reason. Specifically, as is discussed in Section IV.A, infra, the liability of both defendants de Blasio and Cuomo is premised on their actions as policy makers for the City of New York, which if established, would necessarily mean that their actions in deciding and ordering the Curfew "can be imputed to the municipality." McDonough v Nassau County Bd. of Co-op. Educ. Services, 2007 WL 3124550, at *12 (E.D.N.Y. Oct. 25, 2007). However, it is also well settled that "municipalities do not enjoy immunity from suit—either absolute or qualified—under § 1983." See, e.g., Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 166 (1993). A fortiori, if defendants' acts as policy makers are acts of the municipality itself, and the municipality cannot avail itself to qualified immunity, it is at least arguable that qualified immunity is not available to defendants for their acts as policy makers. See, e.g., Myers v Potter, 422 F3d 347, 352 (6th Cir 2005)("The qualified immunity defense is not available to municipalities or to persons acting on behalf of municipalities, such as Police Chief").

has recognized a right, the law of our sister circuits and the holdings of district courts cannot act to render that right clearly established." <u>Pabon v Wright</u>, 459 F3d 241, 255 (2d Cir 2006). Therefore, the logical converse is that "[a]mbiguity in the law cannot be manufactured by borrowing from factually and legally distinguishable cases" from outer circuits. <u>Marrero-Mendez v Calixto-Rodriguez</u>, 830 F3d 38, 48 (1st Cir 2016).

Here, based on the discussion in the immediately preceding subsection (<u>see</u> <u>Bykofsky</u>, <u>Ramos</u>, <u>Williams</u>, <u>supra</u>), it is clear that  both the rights affected, and therefore, the required comportment with heightened constitutional standards, has been clearly established in the context of adult curfews. Oppositely, neither the cases, nor the standard that defendants ascribe to them, have *ever* been accepted by the Second Circuit or Supreme Court.  In fact, the concurrence in <u>R.C. Diocese</u> has recently clarified that there is *no precedent* that "supports cutting the Constitution loose during a [emergency]" and no satisfactory explanation under the law of "why anything other than our usual constitutional standards should apply during [an emergency]." <u>R.C. Diocese</u>, 141 S Ct at 70-71.

Moreover, while defendants' reply briefs will no doubt attempt to use Justice Gorsuch's acknowledgment that courts "have mistaken" an emergency standard to exist as evidence that the law was not clearly established, or to support the reasonableness of defendants' belief regarding same, this is also subterfuge. Indeed, following his comment, Justice Gorsuch explicitly stated that any "mistake" regarding the proper constitutional standard had *nothing* to do with ambiguity in the law, but rather was the result of "a particular judicial impulse to stay out of the way in times of crisis." <u>Id</u>. at 71. Accordingly, since defendants' have pointed to "nothing [controlling] that supports the view that an emergency *displaces* normal constitutional standards" (<u>S. Bay</u>, 959

F3d at 942), and, their entire motion rests on the hopes that this Court will have the same improper judicial impulse to stay out of defendants' way, their arguments must be rejected.

## IV. THE ALLEGATIONS HERE PLAUSIBLY ESTABLISH THE PERSONAL INVOLVEMENT OF BOTH DEFENDANTS

Both defendant de Blasio and defendant Cuomo argue that the allegations in the complaint are insufficient to establish the requisite personal involvement of either defendant for liability to attach under § 1983. However, prior to service of defendants' motions, on November 5, 2020, the parties appeared virtually before this Court to discuss the specifics of those motions. During that conference, in recognition of the factual issue involving the allocation of responsibility for the Curfew between defendant de Blasio and defendant Cuomo, plaintiffs expressly offered to dismiss the claims against one of the defendants if they could simply agree to stipulate to that issue. This procedural history is only mentioned because, to date, defendants have not only been unable or unwilling to agree on that issue, but they now proffer an argument, which if accepted, would mean that *neither* Cuomo *nor* de Blasio had sufficient personal involvement in the decision to issue the Curfew. Such a proposition is nothing short of illogical and only serves to highlight the absurdity of defendants' position on this issue.

### A. There are Ample Allegations and Evidence to Qualify Both Defendant de Blasio and Defendant Cuomo as Policy-Makers for the City

"A policy-maker is someone who is responsible under state law for making policy in a particular area of a municipality's business." Jimenez v City of New York, 605 F Supp 2d 485, 530 (S.D.N.Y. 2009). Although this is a somewhat circular definition, the Supreme Court has explained that the "the question is not" whether a defendant acts for the municipality "in some categorical, 'all or nothing' manner," but rather "whether governmental officials are final policymakers for the local government in a particular area, or on a particular issue." McMillian v

Monroe County, Ala., 520 US 781, 785 (1997). As such, determining whether a particular actor is a policymaker is based on an "understanding of the actual function of a governmental official, in a particular area," as well as the "definition of the official's functions under relevant state law." Id. at 786. Thus, while a policymaker "can be established in several ways," it has been repeatedly recognized that "lawmakers" who have the power to "execut[e] a government's policy or custom," and any other individual "whose edicts or acts may *fairly* be said to represent official policy," will readily meet this criteria for purposes of Monell liability. Portelos v Hill, 719 Fed Appx 37, 40 (2d Cir 2017)(emphasis added).

Here, there is no real plausible reason – and defendants have not offered any – why the governor and the mayor, could not *both* be deemed policymakers for the City. Indeed, "like other governmental entities, municipalities often spread policymaking authority among various officers and official bodies." Pembaur v City of Cincinnati, 475 US 469, 483 (1986). Further, it is particularly beyond the pale for defendant *de Blasio* to allege that his position as Mayor does not establish his ability to make City policy *as a matter of law*. In fact, several courts have found that "[u]nquestionably, the mayor of the City qualifies as a 'policy making authority…[and that] [i]f any one individual can be said to have this authority, it is the highest elected official of the City." Koziol v Hanna, 107 F Supp 2d 170, 181 (N.D.N.Y. August 1, 2000), affd, 10 Fed Appx 36 (2d Cir 2001); Gronowski v Spencer, 424 F3d 285, 296-97 (2d Cir 2005)("Mayor Spencer's actions undoubtedly represent government policy"); Garcia-Diaz v Cintron-Suarez, 120 F Supp 3d 68, 79 (D.P.R. 2015)(recognizing that the mayor was a policymaker, "[l]ike *all* mayors"). Similarly, while defendant Cuomo's personal involvement argument is silent on this precise point, if it was not otherwise clear from his authority as the highest elected official in the state, it is clear from his own public statements that, at minimum, he certainly *believed* that, "*legally* [he]

could impose a curfew," which would certainly make him a plausible policymaker. (Cuomo press briefing on June 1, 2020, *available at* https://nypost.com/2020/06/01/gov-cuomo-raises-possibility-of-nyc-curfew-amid-protests/)(last visited February 3, 2021).

### B. The Rules of Group Pleading Are Not Violated Where the Allegations and Claims are Asserted Against All Defendants Jointly and Severally

Defendants – and principally, defendant Cuomo – also take issue with the fact that the complaint contains dozens of allegations asserted against "defendants" collectively. However, it is well settled that "traditional tort law principles apply equally to a Section 1983 plaintiff." Higazy v Templeton, 505 F3d 161, 181 (2d Cir 2007). Correspondingly, "[a] § 1983 action, like its state tort analogs, employs the principle of proximate causation" (Townes v City of New York, 176 F3d 138, 146 (2d Cir 1999)) and "joint and several [liability]." Sowell v Northrop, 820 F Supp 2d 475, 477 (W.D.N.Y. 2011). In other words, where – as here – defendants are alleged to have "concurrently or consecutively produce[d] a single, indivisible injury," it is "'*axiomatic*'" that they may be "held jointly and severally liable.'" Estate of Booker v. Gomez, 745 F.3d 405, 422 (10th Cir. 2014). Relatedly, while normally "plaintiffs cannot simply 'lump' defendants together for pleading purposes," there is "nothing in Rule 8 [that] prohibits collectively referring to multiple defendants where the complaint alerts defendants that *identical claims are asserted against each*." Canon U.S.A., Inc. v. F & E Trading LLC, 2017 WL 4357339, at *7 (E.D.N.Y. Sept. 29, 2017). Indeed, "where the Complaint makes an allegation that applies equally to all" defendants, "Rule 8 does not require Plaintiffs to identify each of the [] Defendants by name each time." In re Polaroid ERISA Litig., 362 F Supp 2d 461, 471 (S.D.N.Y. 2005).

Here, there is no question that this entire case arises from the acts of issuing and enforcing the Curfew, and there is no debate under the law that causation, liability, and policy-

making authority can be spread amongst different defendants jointly and severally. Accordingly, there is simply no merit to the contention that referring to defendants collectively in connection with allegations relating to the Curfew's decision, issuance, or enforcement, violates any federal pleading standard. See, e.g., LaForgia v Vergano, 2017 WL 3034347, at *5 (S.D.N.Y. July 14, 2017):

> While there may be circumstances in which allegations made collectively against several defendants are insufficiently specific to put the defendants on notice of their alleged conduct, this is not such a scenario. Plaintiffs have alleged that all Individual Defendants, which includes Hoch, took part in the decision to condemn the Property and caused Plaintiffs to be evicted from their home…[this] is sufficient to give [defendant] 'fair notice of what...[P]laintiff[s'] claim is and the grounds upon which it rests'

> Id.

### C. The Factual Allegations and Defendants' Public Acceptance of Personal Responsibility for the Curfew Are More than Sufficient to Establish Liability

Defendant Cuomo also separately contends that the claims against him must be dismissed as a matter of law because his involvement in the decision to issue the Curfew is "contradicted by the Orders themselves." (Cuomo Motion at 6). This contention is laughable.

First, it is well settled that personal involvement may be satisfied by either "'direct participation, such as 'personal participation by one who has knowledge of the facts that rendered the conduct illegal,' or indirect participation, such as 'ordering or helping others to do the unlawful acts.'" Arbuckle v City of New York, 2016 WL 5793741, at *12 (S.D.N.Y. Sept. 30, 2016). As a result, "conduct such as ordering that an arrest be made," – or in this case, ordering, or helping to order, the Curfew – "can suffice to demonstrate direct participation." Gerskovich v Iocco, 2017 WL 3236445, at *4 (S.D.N.Y. July 17, 2017). Second, defendant Cuomo should "assuredly know, the question of personal involvement is a question of *fact*, often precluding determination on summary judgment" or a motion to dismiss. Alford v City of New

York, 413 F Supp 3d 99, 104 (E.D.N.Y. 2018)(emphasis added); Williams v Smith, 781 F2d 319, 323 (2d Cir 1986)(recognizing that "personal involvement is a question of fact"). Third, issues related to comparative responsibility and "causation are [also] issues of fact." Montalvo v U.S. Postal Serv., 1996 WL 935448, at *1 (2d Cir 1996); Higazy, 505 F3d at 175("We have explained that "'foreseeability and causation ... are issues generally and more suitably entrusted to fact finder adjudication.'").

In this case, the acts alleged in the complaint plausibly establish the personal responsibility of *both* defendants – jointly and severally – for *both* the decision to implement and the execution of, the Curfew Orders. In particular, the complaint alleges, inter alia: 1) that "Defendants' Deci[ded] to Issue a Mandatory Citywide Curfew for the First Time in 75 Years in Response to Scattered Incidents of Low-Level Criminal Behavior (Complaint at ¶17 heading); 2) "defendants took the virtually unprecedented step of issuing a citywide Order, which made it illegal and unlawful for any city resident to set foot outside their home;" (id. at ¶17); and, 3) "defendants issued a second Curfew Order, which was substantially identical to the June 1st Order, but which extended and expanded the duration of citywide home confinement – namely, from the hours of 8:00 pm to 5:00 am from June 3, 2020, through June 8, 2020 (id. at ¶19).

Further, at the time the Orders were issued, both defendants publicly claimed joint responsibility for the Orders, which makes any denouncement of responsibility even more puzzling. Specifically, on the first day of the Curfew's issuance, Cuomo issued a press release stating that "[t]onight, *the mayor and I are implementing* a citywide curfew starting at 11 p.m. and *doubling the NYPD presence across the city*." See June 1, 2020 press release, *available at* https://www.nysenate.gov/newsroom/articles/2020/velmanette-montgomery/mayor-de-blasio-and-governor-cuomo-announce-citywide (last visited February 3, 2021). Likewise, on that same

day, de Blasio stated that "[t], to protect against violence and property damage, the *governor and I have decided* to implement a citywide curfew." June 1, 2020 press release, *available at* https://www.governor.ny.gov/news/governor-cuomo-and-mayor-de-blasio-announce-citywide-curfew-new-york-city-will-take-effect (last visited February 3, 2021).

Therefore, since plaintiffs "need not prove [their] allegations at this stage of the proceeding" (Meadows v Planet Aid, Inc., 676 F Supp 2d 83, 95 (E.D.N.Y. 2009)), or figure out the exact manner in which Cuomo decided, counseled, or influenced the Curfew, these allegations taken together with defendants' statements – and anecdotally, their refusal to agree on responsibility between themselves – make plaintiffs' claim of joint responsibility more than plausible. Similarly, the fact that defendant de Blasio was *also* responsible – or even *more* responsible – would still not affect defendant Cuomo's liability, because under principles of joint and several liability "one tortfeasor is not relieved from liability simply because the other tortfeasor also committed liability-causing actions." Manganiello v. Agostini, 2009 WL 151724, at *2 (S.D.N.Y. January 21, 2009). Thus, while defendant Cuomo may wish this Court to "recognize" his statements claiming responsibility "for what [they are]" (Cuomo Motion at 10(fn6)), it is well settled that "assay[ing] the weight of the evidence,' [] is not permitted when adjudicating a motion to dismiss." Sharette v Credit Suisse Intern., 127 F Supp 3d 60, 84 (S.D.N.Y. 2015). Accordingly, whether these statements were simply a sign of "solidarity" (Cuomo Motion at 10(fn6)) or perhaps mere braggadocio from the Governor, the issue of whether, and to what extent he was personally involved in the Orders and/or their enforcement is clearly a factual determination not appropriate for the Court to decide at this stage.

## V.   THERE IS NO LEGAL OR FACTUAL BASIS FOR DEFENDANT CUOMO'S ARGUMENT REGARDING DISMISSAL OF PLAINTIFFS' EQUAL PROTECTION CLAIM

While every claim in this case is related to defendants' collective decision to *issue* the Curfew, there is also an Equal Protection claim related to the Curfew's *enforcement* by defendants. Namely, that they "enforced [the curfew] in predominantly low income, minority neighborhoods and/or otherwise in a manner that predominantly and disparately impacted individuals based on racial classifications." (Complaint at ¶4). While the City defendants' motion is silent on this claim, defendant Cuomo unilaterally seeks to dismiss it, arguing that "plaintiffs have not plausibly alleged the existence of comparators that would allow them to prevail on their selective enforcement claim." (Cuomo Motion at 18). However, like the arguments relating to the Curfew's issuance, this argument is based on a confused view of the law.

### A.   Comparator Evidence is Not Required Where Plaintiffs' Equal Protection Claim Arises from Discriminatory Law Enforcement Practices

While defendant Cuomo asserts that "plaintiffs' claim for selective enforcement of the Curfew Orders against Blacks and other people of color is not adequately pled under well-established legal standards" (Cuomo Motion at 17), it is clear that defendant Cuomo neither understands the nature of the claim, nor understands the "well established legal standards" that govern the Equal Protection claim in this case. First, it is defendant Cuomo – not plaintiffs – who has labeled the Equal Protection Claim as one of "selective enforcement." This is rather peculiar since neither that label nor the word "selective" ever appears anywhere in the pleadings. Further, while it is arguably true that "if a plaintiff seeks to prove selective *prosecution* on the basis of race, he 'must show that similarly situated individuals of a different race were not prosecuted" (Pyke v Cuomo, 258 F3d 107, 109 (2d Cir. 2001)), the "Second Circuit [has] made clear" that where the plaintiffs' claim is based on the allegation:

that a facially neutral law or policy has been applied in an intentionally discriminatory race-based manner, or that a facially neutral statute or policy with an adverse effect was motivated by discriminatory animus, [a plaintiff] *is not obligated* to show a better treated, similarly situated group of individuals of a different race in order to establish a claim of denial of equal protection.

Ali v Connick, 136 F Supp 3d 270, 277-78 (E.D.N.Y. 2015)(citations omitted).

Likewise, "the Second Circuit's decision in Pyke v. Cuomo supports the proposition that a plaintiff can bring an Equal Protection claim with respect to law enforcement conduct *without* alleging selective prosecution." Raza v. City of New York, 998 F. Supp. 2d 70, 80 (E.D.N.Y. 2013)(emphasis added); accord Clack v. Torre, 2014 WL 1050792 *10 (D. Conn. 2014), appeal dismissed (July 11, 2014). For example, in Doe v Vil. of Mamaroneck, 462 F Supp 2d 520 (S.D.N.Y. 2006), the plaintiff's Equal Protection claim – quite similar to the plaintiffs herein – was based on a "targeted ticketing campaign," which "smack[ed] of 'selective enforcement' as *one possible* theory under which to adjudicate the plaintiff's claims." Id. at 544 (emphasis added). However, as Judge McMahon recognized, "where, as here, a particular group [black and minority city residents] was specifically targeted for heightened enforcement of certain types of laws…it will be all but *impossible* to find a similarly situated group of persons." Id. (emphasis added)(alteration added). Consequently, like the situation in Doe, "imposing the similarly situated requirement [here] makes the selective enforcement claim impossible to prove" as it would "require the [plaintiffs'] to make a credible showing that [] similarly situated individual[s] w[ere] *not* stopped [or arrested] by law enforcement." Id. at 545. Thus, since making such a showing would be "virtually impossible" in this case, imposing such a requirement at the pleading stage "effectively denies them any ability to discover or prove such a claim." Id.[23]

---

[23] While it is clear under Pyke, that plaintiff need not allege selective enforcement based on discriminatory law enforcement practices, even where selective enforcement is alleged, "courts have [nevertheless] dispensed with the 'similarly situated group' requirement in cases where the 'differential treatment of the target group could *otherwise* be *clearly demonstrated*.'" Benacquista v. Spratt, 2016 WL 6803156, at *3–4 (N.D.N.Y. 2016)(emphasis

Accordingly, while it may particularly suit defendant Cuomo to narrow plaintiffs' Equal Protection Claims to a single theory of selective enforcement, plaintiffs "need not set out the [] legal theory on which the claim is based, so long as the complaint provides full notice of the circumstances giving rise to the plaintiff's claims." Ali, 136 F Supp 3d at 279 (fn 4).

## B. The Statistical Evidence Provided in the Pleadings as well as the Racial Demographics of the Named Plaintiffs Are Enough to Allow the Claim to Proceed

Notwithstanding that "[t]here are several ways for a plaintiff to plead intentional discrimination that violates the Equal Protection Clause" (Brown v City of Oneonta, New York, 221 F3d 329, 337 (2d Cir 2000)) *without* alleging selective enforcement, even assuming *arguendo* that comparators *were* required for this particular Equal Protection claim, "the law does not require detailed pleadings regarding the similarly situated comparators." Yang v Dept. of Educ. of the City of New York, 2016 WL 4028131, at *9 (E.D.N.Y. July 26, 2016). Similarly, "the plaintiff[s] do[] not need substantial evidence' of [] discriminatory intent" at the pleading stage" because discrimination is seldom proven "by direct evidence and is usually constrained to rely on the cumulative weight of circumstantial evidence." Hill v City of New York, 136 F Supp 3d 304, 335 (E.D.N.Y. 2015), order amended and supplemented, 2019 WL 1900503 (E.D.N.Y. Apr. 29, 2019)(citations omitted). Indeed, "'those with racist intentions do not always verbalize their pernicious motives.'" Capozzi v Pennsylvania Bd. Probation & Parole, 2019 WL 4309069, at *7 (MD. Pa. July 29, 2019), report and recommendation adopted, 2019 WL 4302282 (MD. Pa. Sept. 11, 2019).

---

added)(citation omitted). In those cases, plaintiffs will "be allowed to show discriminatory effect in *some other way*." Doe, 462 F. Supp. 2d at 545 (citing Duque-Nava, 315 F. Supp. 2d 1144,1154–55) (D. Kan. 2004) (emphasis added). Thus, "[t]his strand of equal protection analysis dispenses with the need to plead that a similarly situated group was treated differently because discriminatory effects are either *independently demonstrated* or can readily be presumed." Doe, 462 F. Supp. 2d at 543 (emphasis added).

As a result, Equal Protection Claims "may be established by statistical proof" and other circumstantial evidence. Rossini v Ogilvy & Mather, Inc., 798 F2d 590, 604 (2d Cir 1986); see also United States v City of New York, 683 F Supp 3d 225, 260 (E.D.N.Y. 2010). In fact, "[i]n Equal Protection cases alleging discrimination on account of race, statistical evidence has long been considered crucial in proving discriminatory intent." Santiago v Miles, 774 F Supp 775, 798 (W.D.N.Y. 1991). As such, "pattern or practice discrimination claims generally are proven through evidence of a concrete policy and/or statistical evidence, along with anecdotal evidence of specific instances of discrimination." Hill, 136 F Supp 3d at 332. Thus, while "the use of statistical evidence does not obviate the use of individual comparator evidence," at the pleadings stage – in the absence of any discovery – "statistical proof provides comparator evidence at a broad, generalized level." Chen-Oster v Goldman, Sachs & Co., 2019 WL 3294145, at *1 (S.D.N.Y. June 7, 2019).

Here, plaintiffs have alleged that there were approximately 1,349 arrests made for violating the curfew orders and that Black and minority individuals "managed to receive nearly 70% of the curfew arrests and summonses (over 2 times as many as their white counterparts)." (Complaint at 59). In addition, these numbers were put in the context of the overall City population, of which black and minority residents comprise less than half. (id.).[24] Accordingly, while there may be an innocent explanation for these disparities, it may *also* be true that "a clear pattern, unexplainable on grounds other than race, emerges" from discovery in this case. Vil. of Arlington Hgts. v Metro. Hous. Dev. Corp., 429 US 252, 266 (1977). In the end, however, discovery is necessary because the evaluation of discriminatory intent and purpose "demands a

---

[24] Defendant Cuomo's claim that these statistics "prove[] nothing" because the allegations do not contain "the racial composition of the population that was actually protesting or violating the curfew" (Cuomo Motion at 19(fn.11)), is a red herring. The named plaintiffs were not alleged to have been engaging in protest activity, but rather simply to be outside of their homes engaged in lawful activity.

34

sensitive inquiry into such circumstantial and direct evidence of intent as may be available" (Jana-Rock Const., Inc. v New York State Dept. of Economic Dev., 438 F3d 195, 212 (2d Cir 2006)), and discovery in this case could "bring [these] 'cold numbers convincingly to life'" (Chen-Oster, 2019 WL 3294145, at *1).  Therefore, regardless of the ultimate outcome, since "[t]he impact of the official action whether it bears more heavily on one race than another, may provide an important starting point," (Mhany Mgt., Inc. v County of Nassau, 819 F3d 581, 606 (2d Cir 2016)), the allegations and statistics set forth in the complaint are more than sufficient to nudge this claim from possible to plausible. [25]

## CONCLUSION

For the foregoing reasons, plaintiffs respectfully request that the Court deny defendants' motions in their entirety and allow this case to proceed with discovery.

Dated: New York, New York
           February 10, 2021

                                      Respectfully submitted,


                              By: _____/S_____
                                   JOSHUA P. FITCH
                                   GERALD M. COHEN
                                   COHEN & FITCH LLP
                                   Attorneys for Plaintiffs
                                   110 East 59th Street, Ste 3200
                                   New York, New York 10022

---

[25] To the extent that defendant Cuomo's brief is also arguing a lack of allegations regarding Cuomo's specific discriminatory intent, this argument fails for the same reason. Specifically, based on facts known at this time, it can be readily inferred that all defendants were all involved in deciding to implement the curfew. Therefore, it is similarly reasonable to infer that they were all involved in discussing, contemplating and evaluating the scope of the Curfew and the way it would be enforced. As such, just as was the case with the decision to issue the Curfew, plaintiffs are not – nor could they be – expected to know the particulars of the specific roles that each party played. Rather, because there is ample evidence suggesting that both defendants played some part in setting the Curfew in motion, and because "[u]ltimately [] causation is a question of fact" (Meyer v Shulkin, 710 Fed Appx 453, 456 (2d Cir 2017), as amended (Oct. 11, 2017)), dismissing this claim on that basis prior to discovery would be improper.